(No. 23659.— )

JOHN J. MASTERSON *vs.* JOHN R. WALL.—(HELEN SWEE-NEY, Appellant, *vs.* JOHN R. WALL, Appellee.)

*Opinion filed December 10, 1936—Rehearing denied Feb. 3, 1937.*

HERRICK, C.J., dissenting.

John J. Kelly, and Ernest A. Eklund, (John N. Thornburn, of counsel,) for appellant.

Lloyd C. Whitman, for appellee.

Mr. Justice Wilson delivered the opinion of the court:

John J. Masterson filed a complaint in the superior court of Cook county against John R. Wall to cancel a deed and to rescind a contract. The defendant answered the complaint and the cause was referred to a master in chancery. Masterson, who was eighty-nine years of age at the time the suit was filed, died on April 14, 1935. By leave of court Helen Sweeney, the sole devisee under Masterson's will, filed her amended and supplemental complaint. Wall interposed an answer to her complaint. The master recommended that a decree be entered in favor of the defendant. The chancellor overruled plaintiff's exceptions to the master's report and entered a decree approving the report and dismissing the amended and supplemental complaint for the want of equity. From that decree the substituted plaintiff prosecutes this appeal.

The pertinent facts disclosed by the pleadings and the evidence are as follows: On and prior to November 20, 1934, Masterson owned a parcel of real estate at 5818 Winthrop avenue, Chicago. The building on the premises was a two-story brick structure consisting of two apartments. Masterson, a widower, without descendants, lived in one of these apartments with Michael Dwyer, caretaker of the building. The other apartment was leased. The tenant was in arrears in her rent. Wall is a young attorney at law who lived next door. He became acquainted with Masterson two years prior to his admission to the bar, in 1930. Thereafter he represented Masterson in certain matters. In March, 1934, Masterson retained Wall as his attorney in the administration of his wife's and son's estates. The son's estate had been closed but the administration of

the wife's estate was still pending at the time of making the deed and contract. Wall also wrote Masterson's will in 1934. By it Masterson devised all his property to Helen Sweeney, describing her as "my beloved daughter." Mrs. Sweeney was not, however, related to him. Wall was appointed executor without bond. On November 1, 1934, Wall visited Masterson at the latter's request. The weather was cold. Masterson had no fuel to heat the house, was wrapped in a coat and could not eat, as the cold had affected his appetite. On this occasion Masterson asked for a loan of $10 with which to buy oil to heat the apartment. Wall loaned it to him. In response to a query as to whether Mrs. Sweeney would help him, Masterson replied, "No, she won't do a damn thing." On November 15 and 16 Dwyer, at Wall's home, talked with him relative to an agreement for the support of Masterson. The next day, Masterson, Dwyer and Wall discussed this matter in the Masterson home. Wall informed Masterson he would not enter into an agreement unless Masterson was represented by another attorney, inasmuch as he had transacted legal matters for Masterson. The latter thereupon directed Wall to procure the services of an attorney. To protect Masterson's rights in the contemplated transaction Joseph E. Newton, an attorney at law with whom Wall was acquainted, consented to represent him. Newton prepared a contract from the information furnished by Wall, adding a provision to protect Masterson in the event Wall should pre-decease him. On November 20, Newton, accompanied by Wall and the latter's sister, went to Masterson's apartment. Newton explained to Masterson that Wall had invited him to represent Masterson and inquired whether it was satisfactory. He stated further that there would be no charge for his services, as he understood Masterson had no money. Masterson replied it was all right for Newton to represent him. After giving a copy of the proposed agreement to Dwyer, Newton read the contract aloud, very slowly, paraphrasing

the legal language so that there would be no question in the mind of any layman as to its meaning and frequently asked Masterson if he understood it thoroughly. Masterson replied in the affirmative and expressed his satisfaction with the transaction. The contract was then executed.

The agreement recited that Masterson was advanced in years and unable to provide money for his care and sustenance; that Wall had on several occasions aided him financially; that Masterson having known Wall for many years reposed special trust and confidence in him and desired to make an arrangement with him for the purpose of providing support and maintenance. The contract then provided that Masterson would execute a deed to Wall conveying the property at 5818 Winthrop avenue in fee simple; that Wall, on the other hand, would furnish Masterson $12 a week during his lifetime, permit him to occupy the apartment on the first floor rent free, supply him with sufficient oil to heat the apartment, and, further, take out an insurance policy for $2000 in the Globe Life Insurance Company on Wall's life with Masterson as beneficiary, the premiums to be paid by Wall. In conformity with the contract the deed was executed and delivered. Wall made out his check for $18, representing board for a week and one-half, and delivered it to Masterson. The insurance policy was delivered to Masterson two days later. Wall subsequently paid Newton for his services. Wall made his payments under the contract regularly. Eight checks, for $12 each, in addition to the first one for $18, were accepted by Masterson and cashed. These payments paid the contract up to January 25, 1935. Wall also paid $72.24 for oil between November 23, 1934, and January 21, 1935, and an installment of $11.15 on the refrigerator in the building. Although not required to do so, Wall paid Masterson's past-due gas and electric bills, amounting to $21.37. For a period of approximately two months these expenditures aggregated $218.76. A letter to Masterson dated December 12, 1934, from a

real estate firm, requested information concerning the responsibility and desirability of L. Rivkin as a tenant. Masterson wrote on the original letter, "I have sold the house last month," and signed his name to this statement.

On January 11, 1935, Wall was in the Masterson apartment. Mrs. Sweeney was present and accused him of taking Masterson's property away from him without the latter knowing it. Masterson confirmed her statement. Wall thereupon asked him if he had not called him in some time prior to November 20, 1934, and asked him to support Masterson for the rest of his life in return for the property. Masterson replied that he had, adding that he understood the agreement and was satisfied with it. On this occasion Wall gave Masterson a check for $12, which he accepted. Three days later, namely, on January 14, 1935, Masterson filed his complaint, by which he charged that the deed and contract were obtained without an adequate consideration, by means of misrepresentations of the defendant, and that the plaintiff did not, at the time he executed the instruments, understand the nature thereof. The relief sought was the rescission of the contract and the cancellation of the deed, together with a re-conveyance to the plaintiff. Masterson died on April 14, 1935, after the cause had been referred to a master in chancery. By her amended and supplemental complaint Helen Sweeney charged, in substance, that on November 20, 1934, Masterson was about ninety years of age, in ill-health, weakened mental condition, without income or means of sustenance and in pecuniary distress; that the defendant, as Masterson's attorney, knew these facts and because of the fiduciary relationship existing between Masterson and the defendant Masterson was under improper restraint, was unduly influenced by the defendant to make the agreement and to execute and deliver the deed for the premises to him, and that the consideration therefor was wholly inadequate. Wall's answer averred he had at all times kept the undertakings assumed

by him in the contract; denied the weakened mental condition of Masterson and the undue influence over him by the defendant; denied the relationship of attorney and client with respect to the transaction or that the consideration was inadequate; admitted Masterson was in financial need; averred that Mrs. Sweeney did not come into equity with clean hands; denied she had any right to the premises, and averred that she wrongfully and forcibly seized the premises and was holding them in defiance of law and the defendant's rights.

Evidence as to the value of the property ranged from $4230 to $10,500. The master found its value to be $6000 and the rental value of each apartment to be $45 as of November 20, 1934. Delinquent taxes and special assessments against the premises amounted to $1228.68.

Additional facts and circumstances appear from the record. A check dated January 18, 1935, just four days after Masterson's complaint was filed, is in evidence. Wall testified that he sent this check by mail and at the time did not know the proceeding had been instituted against him by Masterson. In this connection the check has written upon it, in typewriting, "For week ending January 25, 1935, on agreement for support," above the endorsement of Masterson, the payee of the check. A few days later, when Wall offered another check to Masterson at his home, the latter would have accepted it if Mrs. Sweeney had not intervened. She told Masterson that Wall would throw him out in three months. Masterson then refused the proffered payment. So far as the record discloses, Wall never attempted to sell the property. He did endeavor to obtain a mortgage on it in conformity with his statement to Masterson that the first thing he would do would be to make a mortgage loan to pay the taxes and repairs. A check for $12.24, dated January 21, 1935, payable to the order of Masterson, is also in evidence. He in turn endorsed it to an oil company.

The record contains evidence concerning Mrs. Sweeney, the substituted plaintiff. From the testimony of Dwyer it appears that he talked with Mrs. Sweeney about the proposed contract between Masterson and Wall on November 19, 1934, and informed her of the proposed arrangement, and that she said the deal sounded "kind of fishy." A week or ten days after the transaction had been consummated Dwyer saw Mrs. Sweeney with the Masterson-Wall contract. A short time afterwards he talked with her over the telephone and told her he had received a check from Wall for $12, and that she answered "good." A few days later she made substantially the same statement to Dwyer about another $12 check from Wall. On January 18, 1935, Masterson made another will, by which he gave all his property to Mrs. Sweeney, describing her as "the girl who lived with my wife and I for a number of years and for whom we had the deepest love and affection." He appointed her executrix without bond. In her petition for letters testamentary Mrs. Sweeney declared that the real estate owned by Masterson was worth not to exceed $5000.

Masterson himself testified at length in this cause. He stated that he remembered signing papers for Wall on November 20; that he thought Wall then paid him $12; that he did not intend to turn any property over to him; that he did not remember how much he paid for the property or how long he had owned it, and that he did not understand, at the time he signed the papers, he was conveying his property to Wall. The reason he could not say for certain how much he paid for the property, Masterson continued, was because he had dealt in so many pieces of property he could not remember. On cross-examination he testified that he knew at the time he signed the contract it provided something to the effect that Wall was to pay him $12 a week as long as he lived and he was to have the use of the first floor of the building; that Wall was to furnish oil to heat the apartment and was to carry a life in-

surance policy for $2000, payable, on his death, to Masterson. According to Masterson he had no recollection of meeting Newton, but stated that Newton might have been at his house the day he signed the contract. Although he stated he did not remember telling Wall that he had no oil and no money with which to buy any, he admitted that Wall had given him money before the contract was signed—not once but probably a dozen times. At the time he was being given this money, he, Masterson, had money owing him but could not collect it. Masterson further testified he had no recollection of sending Dwyer to Wall to talk about what he could do to obtain money or ever talking to Wall or Dwyer about the contract before it was made; that when they got together they decided that $12 a week would keep him and that Wall made the calculations. The witness explained that he was asking to have the contract set aside because Mrs. Sweeney, to whom he referred as his daughter, was entitled to all his property, and "I make a blunder if I go and give it away to somebody else." Masterson testified further that he did not know who retained the attorneys representing him and that he did not know anything about it.

The evidence shows that shortly after Masterson's death Mrs. Sweeney took possession of the property and refused to deliver it to Wall.

Direct evidence as to the mental condition of Masterson is wanting. The master, who had the benefit of seeing him and of hearing him testify, found that at the time of the execution of the agreement and the deed Masterson was in full possession of his faculties and had a clear and complete understanding of these documents; that on June 4, 1935, Mrs. Sweeney caused to be filed in the probate court of Cook county her petition for the issuance of letters testamentary, and that her acts were evidence of the fact that Masterson was of sound and disposing mind and memory.

To obtain a reversal of the decree, Mrs. Sweeney, the substituted plaintiff, makes the contention that a fiduciary relationship existed between Masterson and the defendant, and that therefore the deed and contract executed on November 20, 1934, were *prima facie* void. The relation of attorney and client is of a highly confidential nature, and it may be conceded that a fiduciary relationship existed between the parties to the transaction assailed. A deed will not be held invalid, however, if made by the grantor with full knowledge of its nature and effect and because of the deliberate, voluntary and intelligent desire of the grantor. (*Allen v. McGill*, 311 Ill. 170; *Winkelman v. Winkelman*, 307 id. 249; *Pillsbury v. Bruns*, 301 id. 578; *Valbert v. Valbert*, 282 id. 415; *Carlock v. Carlock*, 249 id. 330; *Kellogg v. Peddicord*, 181 id. 22.) Where a fiduciary relation exists, the burden of proof is on the grantee or beneficiary of an instrument executed during the existence of such relationship to show the fairness of the transaction, that it was equitable and just and that it did not proceed from undue influence. (*Suchy v. Hajicek*, 364 Ill. 502.) *Allen v. McGill, supra; Rutherford v. Schneider*, 307 Ill. 28; *Pillsbury v. Bruns, supra; Dowie v. Driscoll*, 203 Ill. 480.) This rule applies to contracts between client and attorney made during the existence of such relation and afterwards attacked by the client. (*Warner v. Flack*, 278 Ill. 303; *Willin v. Burdette*, 172 id. 117; *Ross v. Payson*, 160 id. 349; *Morrison v. Smith*, 130 id. 304; *Jennings v. McConnel*, 17 id. 148.) Conversely, an attorney is not prohibited from dealing with his client or buying his property. (*Herr v. Payson*, 157 Ill. 244; *Elmore v. Johnson*, 143 id. 513; *Morrison v. Smith, supra; Laclede Bank v. Keeler*, 109 Ill. 385.) Such contracts, if open, fair and honest, when deliberately made, are as valid as contracts between other parties. Important factors in determining whether a particular transaction is fair include a showing by the fiduciary (1) that he made a full and frank disclosure of

all the relevant information which he had; (2) that the consideration was adequate; and (3) that the principal had independent advice before completing the transaction. 3 Bogert on Trusts and Trustees, sec. 493; *Ziegler* v. *Illinois Trust and Savings Bank,* 245 Ill. 180; *Williams* v. *Langwill,* 241 id. 441; *Herr* v. *Payson, supra.*

Our attention has been directed to Masterson's age. Mental incapacity to execute a deed is not to be inferred merely from old age or ill-health. (*Rutherford* v. *Schneider, supra; Dalbey* v. *Hayes,* 267 Ill. 521.) If a person is capable of understanding, in a reasonable manner, the nature and character of the transaction in which he is engaged and of transacting ordinary business affairs in which his interests are involved he is competent to dispose of his property by deed. (*Thatcher* v. *Kramer,* 347 Ill. 601; *Valbert* v. *Valbert, supra; Greene* v. *Maxwell,* 251 Ill. 335; *Sears* v. *Vaughan,* 230 id. 572.) The record discloses that Masterson, although venerable, understood the details of the transaction in question and was completely satisfied with it, not only on November 20, 1934, but for two months thereafter. There is no testimony to the contrary. It is significant in this regard that the master, who heard Masterson testify less than one month before he died, found that although ninety years of age at the time of the hearing he was in full possession of his faculties and had a clear and complete understanding of the documents which he executed. We have read the transcript of the record of his testimony and find that it sustains the master's finding. Though advisory, the report was approved by the chancellor. Again, Mrs. Sweeney, although she did not testify, caused her petition for letters testamentary to be filed in the probate court. Her petition tends to show that she considered Masterson to be of sound and disposing mind and memory on January 18, 1935, the date the will was executed.

It is true that Masterson was in dire financial circumstances when the contract was executed. He had no children to whom he might look for assistance. The substituted plaintiff, to whom he referred both in the will drawn in 1934 and in the second in 1935 in affectionate terms, refused to render aid and manifested no interest in his welfare until after the contract and deed were executed. The defendant, on the other hand, had given or loaned Masterson money on several occasions, and it was to him that Masterson was compelled to turn in November, 1934. The plan of conveying the property to the defendant originated with Masterson. By acceding to his wishes the defendant undoubtedly prevented Masterson from becoming an object of public charity or an inmate of a charitable institution. Not a scintilla of evidence, however, even tends to show that any influence was exerted upon him to procure the execution of the contract and the conveyance. The provisions of the contract were such as to provide for him a reasonable degree of comfort in his declining years and to give him peace of mind. In return for the property in question the defendant assumed a substantial continuing obligation. During a period of about two months he paid out approximately $200 conformably to the provisions of the contract. We cannot say that the consideration which he agreed to pay was inadequate. He performed his part of the contract until Mrs. Sweeney induced Masterson to refuse further payments. In addition to full disclosure by the defendant and an agreement for the payment of adequate consideration, the evidence shows that Masterson received independent advice prior to the execution of the contract. The fact that attorney Newton happened to be a personal friend of the defendant is immaterial. He was not required to obtain the services of a stranger. We observe that it was upon this attorney's suggestion that a provision favorable to Masterson with respect to a life insurance policy on the defendant's life was incorporated in the

contract. When all the facts and circumstances in the case at bar are considered, the conclusion is inescapable that the defendant has sustained the burden which the relationship of attorney and client cast upon him, by showing that the transaction was fair and equitable and that an adequate consideration was agreed to be paid.

The decree of the superior court is right, and it will be affirmed.

*Decree affirmed.*

Mr. Chief Justice Herrick, dissenting.