BUCKLEY v. ALTHEIMER et al.

No. 8690.

Circuit Court of Appeals, Seventh Circuit.

Dec. 17, 1945.

See also, D.C., 2 F.R.D. 285.

Nat M. Kahn, of Chicago, Ill., Thaddeus G. Benton, of New York City, and David J. A. Hayes, Edward J. Hennessy, and Thomas J. Downs, all of Chicago, Ill. (Thaddeus G. Benton, of New York City, of counsel), for appellant.

Francis X. Busch, Charles R. Sprowl, Irvin Rooks, and Loy N. McIntosh, all of Chicago, Ill., and Hillsman Taylor, of Memphis, Tenn., and Cassius M. Doty, of Chicago, Ill., for appellee Ben J. Altheimer.

Loy N. McIntosh, of Chicago, Ill., for appellees Frost Oil & Gas Co. and J. H. Hines Tie & Timber Co.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Plaintiff, individually and as administrator of the estate of Harry J. Stoops, deceased, brought this action against defendants for an accounting and to recover certain timber lands in Avoyelles Parish, Louisiana.

The case was tried by the court without a jury. Fourteen days were devoted to the trial of the case. Twenty-three witnesses testified for plaintiff, two of these by deposition, and many hundreds of exhibits were introduced. Defendant Altheimer testified in his behalf and he, too, introduced a large number of exhibits. Most of the facts are undisputed. At the conclusion of all the evidence, the court entered judgment against plaintiff and dismissed the complaint for want of equity. To reverse the judgment, plaintiff appeals.

During his lifetime, prior to 1928, Harry J. Stoops was engaged in the buying, selling and exchanging of real estate and in the buying and selling of mortgages on hotels and apartment buildings. Altheimer was admitted to the bar in Arkansas in 1898 and to the Illinois bar in 1909 and since that time has practiced law in Chicago. In 1914 he entered into a partnership with Edwin B. Mayer. In 1924 or 1925 Stoops became a client of Altheimer & Mayer and that relationship continued through the year 1927, and during that period Stoops entrusted large and valuable property interests to their attention. In 1927 Stoops inquired of Altheimer if he knew anyone who held timber land mortgages and gas rights. Among the clients of Altheimer & Mayer at that time was one J. H. Hines of Memphis, Tennessee, who owned interests in the types of properties Stoops wanted to acquire. Altheimer introduced and brought Stoops and Hines together. At this time Hines was badly involved financially. He controlled a corporation known as J. H. Hines Co., Inc., which had the record title to a 10,600 acre tract of land, against which, since 1927, a foreclosure suit, foreclosing a bond issue of $150,000, had been pending in a federal court at Shreveport, Louisiana. Adjacent to this land was another tract of 15,000 acres, the title to which was in the National Lumber & Tie Corporation. Hines had an option to acquire this tract.

On February 1, 1928, Stoops and Hines entered into a contract respecting the various property interests owned by Hines, the terms of which were negotiated directly between Stoops and Hines and, after its terms had been agreed upon, at their request, Altheimer reduced their understanding to writing. By this contract Stoops agreed that within 50 days he would: 1. Respecting the bonds of J. H. Hines Company (a) pay off or discharge such of those bonds as were in the hands of others, and (b) pay off or discharge the debts of J. H. Hines Company secured by a deposit of such bonds. 2. Pay the amount due one James H. Allen for his interest in the 15,000 acre tract owned by National Lumber & Tie Company. 3. Furnish $150,000 to Tularosa Tie & Lumber Company. Should Stoops perform his part of the agreement, Hines agreed that he would convey and assign to Stoops the following: (a) Hines' option to the 15,000 acre tract; Hines' 250 shares of National Lumber & Tie Company stock; (b) fee simple title to the 10,600 acre tract of land; (c) one-half of the capital stock of Tularosa Tie & Lumber Company; and (d) one-half of the common stock of Sacramento Tie Company.

It was Stoops' plan, upon acquiring these lands, to place the title to the oil, gas and minerals in the 25,000 acres in a corporation to be formed under the name of Frost Oil & Gas Company, and to put the title to the land excepting the oil, gas and minerals in a corporation to be formed under the name of J. H. Hines Tie & Timber Company. This latter company was to put a trust deed on the 15,000 acre tract securing its bonds for $300,000 and a trust deed on the 10,600 acre tract for $200,000. The trust deeds and bonds were executed and these Stoops planned to sell. The corporations were formed and both were organized under the laws of the State of Delaware, and the record title to the land became vested in the Tie & Timber Company and the mineral, gas and oil rights were vested in the Frost Company.

Prior to February 1, 1928, Hines had owed Altheimer & Mayer $17,500 on his note, secured in part by $12,500 Hines Company defaulted mortgage bonds, then in foreclosure. These bonds were a part of the bonds which Stoops was to acquire and cancel by his agreement of February 1. February 16, 1928, there came into Altheimer & Mayer's office drafts for $22,500, having attached thereto 250 shares of National stock and $2,000 of the bonds of Hines Company. Stoops, having only $12,500 to apply towards the payment of these drafts, borrowed $10,000 of Altheimer and

gave his note to Altheimer & Mayer for $22,500. Concerning this loan, Altheimer, in a memorandum to Mayer, wrote: "I agreed to advance him [Stoops] $10,000 provided he took over $12,500 of the bonds that were collateral to the Hines note to us at par." The 250 shares of National stock and the Hines Company bonds were then put up as collateral for Stoops' note for $22,500 to Altheimer & Mayer with a Chicago bank.

On March 9, 1928, the option to acquire the 15,000 acre tract was to expire. An extension of that option was obtained by turning over to National 125 shares of the 250 shares of that company's stock securing Stoops' note. The Chicago bank released the 125 shares when Daniel E. Frost, one of Stoops' financial backers, advanced $5,000 upon Stoops' note, thereby reducing the $22,500 note to $17,500. April 12, with $10,000 of Frost's money and $5,000 of his own funds, Stoops further reduced his note to $2,500, and the Chicago bank released the remaining 125 shares of National stock. However, the extension of the option was again about to expire and Stoops was not able to pay Allen for his release or raise the $50,000 required to be paid to National. He requested Altheimer & Mayer to assist him. Altheimer & Mayer borrowed $50,000 upon their note from a Chicago bank and Altheimer prevailed upon Allen to look to him for the payment of Allen's claim against National, which Allen was willing to release for $17,500. April 12, 1928, Stoops signed an agreement which provided that Altheimer & Mayer should hold the title to the 15,000 acres as security for their $50,000 advance and $10,000 of Allen's claim, Stoops having given Allen his note for $7,500 for the balance due. By the agreement it was also provided that in the event title to the 15,000 acres and title to the oil and gas rights should be put in a corporation or corporations, all of the stocks and bonds of those companies should be held by Altheimer & Mayer as security for their advances. April 13, Altheimer delivered to National the remaining 125 shares of its stock, the releases of Hines and Allen, and a check for $50,000, and received in exchange therefor a deed for the 15,000 acre tract to Alan Altheimer, the nominee of Altheimer & Mayer. In the meantime, as already noted, Frost Oil & Gas Company and J. H. Hines Tie and Timber Company had been formed, and under the agreement of April 12, Altheimer & Mayer held all of the stock and bonds of these corporations as security for their advances.

May 18, 1928, Stoops increased the $2,500 balance of his note to Altheimer & Mayer to $4,000, leaving $6,000 of Hines Company bonds as collateral, and transferred $8,500 of such bonds as collateral to the $4,500 due on Hines' note, which Stoops had agreed to pay. September 13, 1928, Altheimer personally took over and assumed the obligations of Altheimer & Mayer on their $50,000 note, as well as on the $4,000 Stoops note and the $4,500 Hines note, and received all of the collateral securing these notes.

We have already observed that in the contract of February 1, Stoops agreed with Hines that he would, within 50 days, acquire all of the $150,000 bonds of the Hines Company, secured by a trust deed, which trust deed was then in foreclosure and a sale of the property had been advertised. Several extensions of this sale were obtained. The first of such extensions was obtained on February 7, when Stoops paid Altheimer $3,000 which Altheimer forwarded to the receiver in the foreclosure suit; a second, when Stoops paid $4,000 to the receiver to use for the payment of taxes; and a third, on December 17, 1928, when Frost sent $5,000 to the receiver.

At this time Stoops owed Altheimer, Altheimer & Mayer and others in connection with the 15,000 acre tract, $112,760, for which he executed, on November 20, 1928, his note for $100,000 and on November 22, 1928, a note for $10,000. The $100,000 note was secured by $300,000 par value bonds on the 15,000 acre-tract, 60% of the stock of J. H. Hines Tie & Timber Company, 42% of the stock of Frost Oil & Gas Company, and that part of the J. H. Hines Company bonds which Stoops should thereafter acquire with his own money. Between February 1, 1928 and November 30, 1929, the date of the foreclosure sale, bonds of the J. H. Hines Company, par value $92,000, were acquired for $39,950. Of these Frost, on November 10, 1928, acquired $30,000, paying therefor $15,000. These Frost pledged with Altheimer as further security for Stoops' $100,000 note. The remaining $62,000 par value of these bonds were acquired for $24,950, Altheimer advancing $17,450 and Stoops $7,500. The bonds acquired by Stoops were also pledged with Altheimer as security for Stoops' $100,000 note.

On November 6, 1929, Stoops had a paralytic stroke and suffered a complete physical and mental collapse from which he never recovered. April 9, 1930, he was adjudged insane. He died May 8, 1932, and on January 2, 1941, plaintiff was appointed administrator of his estate. At the time of trial, plaintiff was sole distributee of her father's estate. In her original brief, plaintiff claimed that up to November 6, 1929, her father, with his own funds and with moneys advanced for him by Frost, had invested $52,000.

The foreclosure sale was held on November 30, 1929. To save whatever funds had thus far been invested in the project, Altheimer bid $50,000, later reduced to $41,000, for the property by allowing a credit of $9,000 paid to the receiver for taxes. After discharging the fees due to various parties in the foreclosure proceedings, $33,000 remained to be paid. Altheimer advanced and paid $20,559.27 of this amount in cash. The balance of $12,440.73 represented the distribution value of the Hines Company bonds in Altheimer's hands, which bonds he delivered to the receiver. The par value of these bonds was $110,050. In addition to these bonds, Altheimer acquired $8,500 par value of the Hines Company bonds from a bank holding them as collateral for Hines' $4,500 note, $6,000 of bonds from the Chicago bank pledged to secure Stoops' note, and $3,550 of bonds from the Tremont Lumber Company.

Thus it appears that in connection with the 10,600 acre tract Altheimer had paid out $56,009.27, exclusive of interest on bank loans and taxes and other expenses, and $64,425 in connection with the acquisition of the 15,000 acre tract. The record also reveals in connection with both tracts, that in addition to the $56,009.27 paid out by Altheimer, Altheimer paid $42,465.66 for taxes, $6,813.50 for attorneys' fees and $3,201.99 for expenses, making a total of $172,915.42, no part of which, excepting $29,739.50 received as rental of these lands, has even been repaid to Altheimer by Stoops or anyone in his behalf.

Tularosa Tie & Lumber Company was engaged in cutting timber in Otero County, New Mexico, and in the manufacture and delivery of lumber. The cutting rights were actually owned by the Sacramento Tie Company, which had a contract to furnish ties to the Southern Pacific Railroad, which contract Tularosa had assumed and agreed to perform. All of the stock of Tularosa was owned by Hines but had been pledged to L. K. Salsbury as security for a debt of Tularosa. All of the common stock of Sacramento was also owned by Hines.

As we have already noted, by the agreement of February 1, 1928, Stoops agreed, within 50 days, to advance $150,000 to Tularosa, which sum was to be used to pay debts due to Salsbury and to furnish Tularosa with working capital. Stoops failed to make the agreed advance, and by October, 1928, Salsbury, to satisfy the amounts due him, threatened to take over the Tularosa stock. However, on October 27, Salsbury agreed with Stoops that he would wait until November 26 for the payment due, provided Stoops would within fifteen days purchase from Salsbury certain Hines Company bonds and pay $100,000 on the Tularosa debt or notes.

Stoops, being unable to raise the $100,000, requested Altheimer's assistance. November 20, 1928, Stoops, Hines and Altheimer entered into an agreement which provided that if Altheimer would pay Salsbury $60,000 and interest due him from Hines and take up $40,000 of Tularosa's notes held by Salsbury, all of the stock of Tularosa and Sacramento would be held by Altheimer as security for his advances, and that when Altheimer was repaid the amounts advanced, the stock of Tularosa and Sacramento would be divided as follows: 37½% to Hines, 37½% to Stoops, 20% to Altheimer, and 5% to Altheimer & Mayer. By the agreement Stoops also agreed that he would purchase within six months five notes, for $20,000 each, of the Tularosa Company, due on or before 1, 2, 3, 4 and 5 years after date, with which to pay the amounts advanced by Altheimer; and that if Stoops failed to purchase the notes and pay the $100,000 within the six months, then the 37½% of the stock would not be delivered to him but should be retained by Altheimer, provided Altheimer exchanged the indebtedness due him for the Tularosa notes.

It was contemplated that the $100,000 agreed to be advanced by Altheimer would leave $10,000 working capital for Tularosa. It developed that $106,720 was due Salsbury. To pay this amount, Altheimer delivered to Salsbury his check for $60,000 and a check of Tularosa for $46,720. To raise these amounts, Altheimer personally borrowed $50,000 from the Northern Trust Company and had Tularosa borrow $50,000 from the same bank on its note endorsed by

Altheimer. Altheimer agreed to raise the additional $10,000 on the assurance of Stoops and Frost that it would be repaid to him. It was repaid by Frost upon the assurance that Stoops would contribute $6,720 to Tularosa. Stoops could not raise his promised contribution, but gave his note for $6,750 to Tularosa. The note, however, was never paid, nor did Stoops ever advance any part of the $100,000 he had agreed to loan to Tularosa.

Tularosa was in financial difficulties from November 20, 1928, until it became insolvent and ceased its operation in 1932. During this period, Altheimer advanced to Tularosa $262,280.26. This amount includes the amounts he raised on November 22, 1928. In the same period he received from Tularosa $102,040, making his net expenditures $160,240.26. Additional discussion of Tularosa will be made later in this opinion.

Plaintiff contends that the court erred in not referring the case to a master in chancery. She makes the point that the transactions involved were intricate, numerous and complicated; that the court had been advised that the trial of the case would take two or three weeks; and that during the course of the trial (eleventh day), her counsel suggested that a master should hear some of the details.

A reference to a master shall be the exception and not the rule. In actions to be tried without a jury, save in matters of account, a reference shall be made only upon a showing that some exceptional condition requires it. Federal Rules of Civil Procedure, rule 53(b), 28 U.S.C.A. following section 723c. Hence, whether any cause shall be referred to a master rests within the discretion of the trial judge. Even in suits for accounting, no reference will be made until there has been sufficient evidence showing the necessity for an accounting. Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919; Columbian Equipment Co. v. Mercantile Trust & Deposit Co., 5 Cir., 113 F. 23; Barrick v. Pratt, 5 Cir., 32 F.2d 732; and Barnard-Curtiss Co. v. Maehl, 9 Cir., 117 F.2d 7. While a court of equity may refer issues, or the entire suit, to a special master, it is far better practice for the court to hear and determine the fact issues decisive of the right to a money decree before ordering a reference. O'Cedar Corporation v. Woolworth Co. 7 Cir., 73 F.2d 366. We are satisfied, under the state of this record, that it was not an abuse of discretion to fail to make a reference.

Plaintiff next makes the contention that when the court rejected her offer of proof as to the intended testimony of Ferdinand Parsons and excluded a book kept by Frost, it committed reversible error. We do not think so.

Concerning Parsons, the record reveals that the trial of the case was commenced on April 28, 1944, and was concluded May 17. Throughout the trial, plaintiff's attorney referred to an auditor named Lensing, of Bacon & Company, who was present in the court room and who had examined various books of account for plaintiff. During the morning session of May 17, counsel for the first time mentioned Parsons, and, after stating that on May 12 Parsons underwent a major surgical operation, requested an adjournment of the trial. The motion being denied, counsel then made an offer of proof to the effect that as the result of an examination of Tularosa's books, Parsons, if present, would testify that the balance due Altheimer from Tularosa on December 31, 1932, was $137,433.06. No other claim was made as to the materiality of Parson's testimony. Defendants' counsel refused to admit that Parsons would so testify, and stated that Tularosa's books were in the court room and offered them in evidence and they were received.

The facts relative to the Frost book are these. Frost was a lawyer and, as we have already observed, one of Stoops' financial backers, but there was no evidence that he was engaged in business as a money lender or that he kept any regular set of records of any such transactions. The book offered and rejected was a diary in which Frost made entries. The book did not contain any regular set of entries relating to any accounts between Frost and Altheimer.

In arguing for the admission of the book, no claim is made that the entries were made in the regular course of business. What plaintiff does urge is: "Although the book was informally kept, the entries therein were made precisely and meticulously by Frost at or about the time the transactions listed occurred or immediately thereafter."

We are not unmindful that the Act of 1936, 28 U.S.C.A. § 695, renders admissible as evidence any writing of record in a book made as a record of any act, if made in the regular course of business, and that it should be liberally interpreted so as to do

away with the anachronistic rules which gave rise to its need and at which it was aimed, Palmer v. Hoffman, 318 U.S. 109, 115, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719; nevertheless, entries in private diaries as distinguished from account books or individual memoranda of particular transactions are, as a general rule, inadmissible as evidence as proof of the facts stated therein, 20 Am.Jur. § 942 p. 796. The prerequisites to admissibility are that the entries shall have been made in the usual course of business as the record of acts or transactions then occurring. United States v. Quick, 3 Cir., 128 F.2d 832.

Under plaintiff's next contention it is claimed that Altheimer's dealings with Stoops were presumptively fraudulent and that Altheimer became a constructive trustee for Stoops.

The argument is that Altheimer had no right to use, in reduction of his bid at the foreclosure sale, whatever money Stoops had paid to the receiver for the payment of taxes and that when an attorney enters into business dealings with a client the burden is on the attorney to show the fairness of all the business transactions. In support of her contention she cites, among other cases, Masterson v. Wall, 365 Ill. 102, 6 N.E.2d 161, and Doner v. Phoenix Land Bank, 381 Ill. 106, 45 N.E.2d 20.

■ To be sure, the relation of attorney and client is of a highly confidential nature and their dealings will be scrutinized closely in order to guard against wrong being committed. Where that relation exists, the law requires that the attorney show the fairness of the transaction and that it did not proceed from undue influence, but an attorney is not prohibited from dealing with his client, and "contracts, if open, fair, and honest, when deliberately made, are as valid as contracts between other parties." Masterson v. Wall, supra, 365 Ill. 110, 6 N.E.2d 165.

■ In our case, it does not appear that undue influence was used or that Altheimer concealed any fact from Stoops. On the contrary, Altheimer has given plaintiff all the information that she requested and has permitted her to have complete access to his books and papers. When all the facts and circumstances are scrutinized and considered, it is clear that Altheimer has sustained the burden which the relationship existing between them cast upon him.

In the case of Doner v. Phoenix, supra, it was said that anyone occupying a fiduciary relation, such as an attorney, cannot deal with the subject matter of the relationship to his own advantage, and if he obtains title to property, he becomes a constructive trustee for the principal. That rule, however, is inapplicable here. Altheimer gained no advantage to himself. At that time he held whatever interest Stoops had in the Louisiana lands for Stoops. He never claimed otherwise.

Plaintiff urges next that the court erred when it failed to compel Altheimer to account for the profits on Southern Pacific sales.

It appears from the record that plaintiff offered in evidence a statement (plaintiff's exhibit 51) prepared by Southern Pacific showing its gross payments for ties from August 21, 1925 to December 31, 1941, totaling $2,325,222.71.

It appears that in 1932 Southern Pacific, under its contract with Sacramento Tie Company, assumed by Tularosa, claimed that Tularosa's deliveries of ties were not in accordance with its contract. Tularosa contended to the contrary, but could not prevail upon the railroad to accept the ties. As a result, Tularosa was compelled to cease its operations.

On September 12, 1932, Hines succeeded, at a lower price, in obtaining a new contract from Southern Pacific. This contract, on October 1, 1932, Hines caused to be assigned to United Tie Company, a newly formed corporation, and that company performed the contract until August 27, 1940, when the contract was assigned to the Consolidated Tie Company. March 7, 1933, Hines entered into a contract with Altheimer, who then held the title to the 10,600 acre tract and the stock of the corporations holding title to the 15,000 acre tract as collateral security for moneys advanced by him at the request of Stoops and Hines in connection with those properties. By this contract they determined that as of December 31, 1931, there was due Altheimer for his advances in connection with Tularosa and Salsbury $176,000, and $137,000 for his advances in connection with the Louisiana lands. Hines then caused United to execute its notes to Altheimer for $176,000 and J. H. Hines Company its notes to Altheimer for $137,000, and it was agreed that Altheimer would receive $4 per thousand feet board measure of ties shipped to Southern

Pacific until the United notes were paid, and $2 thereafter until the Hines note was paid. Following March 7, 1933, Hines applied himself to the business of United Tie Company and continued to do so up to the time of his death on April 12, 1936. From October, 1932, to May 12, 1944, $266,905.53 was paid to Altheimer on accounts of these notes. In the contract of March 7, 1933, it was provided that after the full payment of the notes, "Altheimer shall transfer and assign to J. H. Hines all of the collateral in his hands except such as applies to the twenty-five thousand acres in Avoyelles Parish, Louisiana, and as to that, an undivided one-half interest in and to said twenty-five thousand acres of land in Avoyelles Parish, Louisiana, with all rights thereon, and also in and to any and all bonds or obligations secured by mortgage upon said property shall be transferred to J. H. Hines, and the other half to be the property of Ben J. Altheimer."

In the argument plaintiff claims that Altheimer should be charged to the extent of her interest in these sales, less any proper expenditures he can prove that he made from the gross sum of $2,325,222.71.

At the conclusion of all the evidence, the trial court, in its order of dismissal, found that "Stoops was never able to comply with the provisions of his contract of February 1, 1928 with Hines, whereby Stoops was to advance $150,000 to Tularosa Tie and Lumber Company" and because of that fact concluded that Stoops thereby lost his right to receive any stock in the Tularosa and Sacramento Companies.

■ Upon consideration of the entire record, it is clear that there was sufficient evidence from which the court could conclude that since Stoops failed entirely in his obligation to furnish the $150,000, he never acquired any interest in the Tularosa Tie & Lumber Company or the Sacramento Tie Company, and hence plaintiff was not entitled to an accounting concerning the Southern Pacific sales.

■ Plaintiff insists that Altheimer failed to disclose to her many material facts, and that, as a result, two certain releases executed by her are invalid.

She testified that Altheimer told her nothing about his control of Sacramento Tie Company nor the amount of money that had been paid by Southern Pacific. However, the record clearly discloses that in the fall of 1929 and thereafter up to and in-

cluding April 25, 1936, plaintiff had many meetings and conversations with Altheimer in which he told her of the Louisiana lands, of the taxes and other charges that he had paid respecting them, and of the money he had in the properties. May 22, 1930, one Clarence Mayer, acting in plaintiff's behalf, requested information of Altheimer concerning these lands and the Tularosa operations. May 29, 1930, Altheimer sent Mayer a letter, setting out in detail the information requested, and specially referred to the February 1 Stoops-Hines contract. In the letter he explained the manner in which the 15,000 acre tract had been acquired and the manner in which the 10,-600 acre tract had been bought at the foreclosure sale. The letter also explained the nature of the operations of Tularosa, its contract with the Southern Pacific Railway Company for the sale of ties and of the amount of Altheimer's advances of 1928 to pay the Tularosa indebtedness to Salsbury.

In 1930 plaintiff employed a well known Chicago law firm to look into her father's affairs and turned over to the firm the papers relating thereto, including the Mayer letter of May 29. A member of that firm, testifying for plaintiff, stated that he called on Altheimer and that he felt that Altheimer was "rather frank about the things I asked him." In 1931 Mayer introduced plaintiff to Lewis E. Pennish, another Chicago lawyer. Pennish testified that he talked to Altheimer several times in 1932, 1933, and 1936; that he went over the papers which he had received and asked plaintiff about them. March 14, 1932, Altheimer wrote to plaintiff concerning his efforts to work out satisfactory arrangements for Tularosa with the Southern Pacific and of his inability to pay the taxes on the Louisiana lands.

In July of 1933 plaintiff knew that Hines had some equity in the Louisiana lands, that there was an agreement between her father, Hines, Altheimer and Frost concerning a division of the stock of the different timber companies, and that these companies were Tularosa, Sacramento, J. H. Hines Tie & Lumber Company and Frost Oil & Gas Company. She also knew that Hines then held the title to the property and that Altheimer claimed more than $100,000; that her father had put up bonds as collateral security with Altheimer for money advanced; and that Altheimer had upwards of $100,000 ahead of the Frost and Stoops claims. She knew of the existence

of the March 7, 1933 contract and recognized it as a proper means by which Altheimer might be repaid the sums he had advanced.

On April 22, 1936, plaintiff telephoned from New York and spoke to Mayer, Altheimer's law partner. She told him her mother was ill and asked him to send her $50 so she could come to Chicago. Mayer sent her the money. Plaintiff arrived in Chicago the next day and took her mother to the hospital. Her mother passed away that evening. On the following day plaintiff went to see Altheimer and asked h:m to advance her $600. At this time she already owed Altheimer $1,426.51 for prior advances. Altheimer said he was not in a position to help her but told her that if Pennish, her lawyer, would advance half of this amount, he would advance the other half. Altheimer then telephoned Pennish and requested h:m to come to his office, which Pennish did. Pennish said he could not make any advance to plaintiff. In the meeting that followed Altheimer told plaintiff and Pennish the general situation respecting the Louisiana lands and the taxes thereon, and showed them Stoops' note for $100,000. He told them of the Stoops-Hines contract and the amount due to Altheimer, and that he had carried Stoops' obligations for eight years without foreclosing. Plaintiff then discussed an arrangement whereby she would execute a conveyance to Altheimer of Stoops' interest in the properties involved in the February 1, 1928, contract and in the collateral held by Altheimer, in exchange for which Altheimer would cancel her debt to him and pay her $600 additional. The form of the papers was also discussed and it was agreed that the plaintiff should also accept a notice of foreclosure and present her petition to the Probate Court of Cook County, Illinois, requesting authority to execute the conveyance. During this meeting some of the papers were prepared.

On April 25 plaintiff and Pennish returned to Altheimer's office. Further papers were drawn, Pennish participating in their dictation. At this meeting plaintiff, individually and as administrator of her father's estate, executed and delivered to Altheimer an instrument which conveyed to Altheimer all the rights Stoops or the plaintiff, as his administratrix, had in the properties involved in the February 1, 1928 contract and in the collateral deposited by Stoops. At the same time she signed a petition addressed to the Probate Court respecting the conveyance she had delivered to Altheimer and accepted from Altheimer a notice of a foreclosure sale respecting the collateral to Stoops' $100,000 note. On the same day she also delivered to Altheimer a letter stating that she appreciated Altheimer's not having foreclosed on the collateral deposited with him by her father; that she knew her father had made no payments to Altheimer since 1929; that she knew Altheimer had not foreclosed in order to give her a chance to redeem, but that she was unable to do so; that she accepted the notice of sale; and that any further notices Altheimer deemed necessary should be served on Pennish. Altheimer then cancelled the $1,426.51 indebtedness due him from plaintiff, and paid her $600. Pennish testified that he left Altheimer's office intending to present the petition to the Probate Court, but it was never so presented. May 1, 1936, in accordance with the notice of foreclosure served on plaintiff on April 25, 1936, Altheimer foreclosed on the collateral which he held for Stoops' $100,000 note, a report of which he sent to Pennish.

On November 5, 1936, Samuel Zeiger, a New York lawyer, came to Chicago and requested that Altheimer convey to plaintiff the oil, gas and mineral rights in a part of the Louisiana lands. November 6 Altheimer agreed to do so, provided she would make no further claims against him and that she would have an order entered by the Probate Court approving the settlement. February 24, 1937, Zeiger wrote Altheimer that the Probate order required by the agreement was nonessential since Altheimer had wiped out the Stoops' claim by foreclosure, and asked Altheimer to waive the necessity of such an order. February 27 Altheimer answered Zeiger that he would not require the order and would cause to be conveyed to plaintiff the rights requested in 2,000 acres if the plaintiff would furnish him with the same kind of letter that Zeiger would want if he were representing clients having the same proposition.

Zeiger prepared such a letter, dated March 8, 1937. The information contained in the letter was obtained by Zeiger from plaintiff, from correspondence and papers in his possession, and from the agreement of November 6, between Altheimer and plaintiff. Plaintiff then copied the letter

in her own handwriting, understood it, and, with her consent and approval, Zeiger mailed it to Altheimer. In the letter plaintiff refers to the Louisiana and New Mexico properties and stated that it was unfortunate that her father was unable to pay his obligations to Altheimer; that she deeply appreciated Altheimer's having carried her father's obligations for so many years after maturity; and that she understood that Altheimer had finally sold the collateral which he held for her father's obligations. In the letter she also stated: "I know that I have no rights or claims against you or any persons or companies connected with father's enterprises, specifically J. H. Hines Tie & Timber Company, Frost Oil & Gas Company, Herman A. Kabaker, Sacramento Tie Company, Tularosa Lumber Products Company, J. H. Hines, and yourself, and I make no pretense of having any. I say this in all sincerity and without condition or mental reservation of any kind."

Upon receipt of this letter, Altheimer delivered to plaintiff the deed of Frost Oil & Gas Company, dated June 7, 1937, conveying to her the oil, gas and mineral rights in the 2,000 acres agreed upon. Thereafter plaintiff dealt with the property conveyed to her. July 16, 1937, she assigned a one-quarter interest in the rights conveyed to her to Louise M. Sachs. November 1, 1938, she and Louise M. Sachs conveyed the rights to the California Company, and plaintiff received approximately $1,200 in rentals from this lease. January 16, 1940, plaintiff assigned an additional one-quarter interest in the 2,000 acres to Emma Ackermann and on March 1, 1940, she conveyed another one-quarter interest to Katherine Jensen.

The trial court found that: "Altheimer has never concealed from * * * plaintiff * * * any fact respecting his business transactions with Stoops but, on the contrary, has * * * fully, fairly and frankly answered all of the plaintiff's inquiries respecting the same, * * *. Not only did defendant Altheimer so conduct himself * * * but * * * Altheimer made available to the plaintiff and to her then attorneys, complete access to all of his files, checks, correspondence, books, records and personal memoranda relating to the various transactions between himself and Stoops, as well as to the books and records of all of the companies having anything to do with said transactions * * *.

"Defendant Altheimer's conduct in connection with his transactions with Harry J. Stoops, both during Stoops' lifetime and following Stoops' death to the present time, has been in full compliance with the strictest rules of law and ethics relating to the duties of a lawyer to his client, and to the duties of a lawyer to render accountings under such circumstances. Defendant Altheimer's conduct in these many transactions over the years has been exemplary." These findings seem to be fully sustained by the evidence; hence, we would not be warranted in holding the releases invalid.

The next supposed error complained of concerns the conduct of the trial.

■ Plaintiff insists that the trial judge showed hostility and prejudice, pre-judged the issues, was impatient, and compelled plaintiff to try the case under pressure and under constant threats that he would send her counsel to jail, would fine him, and would punish him for contempt of court, although his conduct at no time justified any of the threats. We have examined the record, especially that part containing the passages of which plaintiff complains. There is no evidence that the court was prejudiced against plaintiff or that he had pre-judged the case. True, on several occasions during the trial, the court did suggest that counsel had wasted time and told him to get some facts into the evidence, that he would have to hurry and get through with the case, and on May 16, the thirteenth day of the trial, the court said " * * * patience ceases to be a virtue. If you do not proceed differently from the way you have been doing, you are going to spend some few days in jail * * *. Now you proceed." While at times the judge might have indicated impatience, nevertheless we would not be warranted in holding that this constituted bias or prejudice calling for a reversal.

Plaintiff in her main brief and in her supplemental briefs refers to some other questions, such as, that when Altheimer drew the contract of February 1, he represented conflicting interests, that his motives were improper, that the March 7, 1933, contract between Altheimer and Hines was void from its inception, and that Altheimer's accounting was incomplete. These we have considered, but it will not be necessary to discuss them here, since they do not change the conclusions we have reached.

The judgment of the District Court will be affirmed. It is so ordered.