(No. 21011. )
ARTHUR THATCHER, Admr., Defendant in Error, *vs.*
WILLIAM F. KRAMER *et al.* Plaintiffs in Error.

*Opinion filed February 19, 1932—Rehearing denied April 8, 1932.*

O'NEILL & O'NEILL, and J. P. STREUBER, for plaintiffs in error.

P. M. HAMILTON, and GILSON BROWN, for defendant in error.

Mr. JUSTICE ORR delivered the opinion of the court:

In February, 1929, a bill in chancery was filed in the circuit court of Madison county by the administrator of the estate of Murray B. Trabue, deceased, to cancel certain

notes, mortgages and trust deeds and to release certain judgments growing out of a real estate transaction between the deceased and William F. Kramer, negotiated on September 14, 1928. A large amount of testimony was taken before the master in chancery, who submitted his findings with a recommendation that a decree be entered finding the issues in favor of the defendant. Exceptions to the master's report were taken and argued before the chancellor, and in February, 1931, the exceptions were sustained and a decree entered in favor of the complainant, directing the cancellation of the deeds and other instruments by which the real estate exchange had been effected. To reverse that decree the present writ of error was sued out.

Trabue died intestate on February 7, 1929. Three weeks before his death he had been adjudged of unsound mind and incompetent to manage and care for his property by the county court of Jersey county. At the time of his death he was about seventy-five years old, and the bill alleged that for more than two years prior to his death he had been in failing health and was incompetent to transact his business affairs or protect his own interests. On September 14, 1928, he entered into the deal with Kramer by which he parted with title to a 600-acre farm in Greene county, subject to mortgage indebtedness, taxes and interest totaling $46,750.57, in exchange for 140 acres of farm land in Madison county and eight tracts of improved city property in Alton and Wood River subject to a total mortgage indebtedness of $36,100. He also paid Kramer $3500 in cash, gave him a judgment note for $3500, and received from Kramer a bill of sale conveying to Trabue about $1500 worth of personal property located on the Madison county farm. After this trade Kramer continued in possession of the improved city properties, collecting the rents as Trabue's agent. The bill charges that Kramer employed William F. Wade as a salesman to assist in the trade; that Wade formerly lived in Jerseyville and was ac-

quainted with Trabue; that Kramer fraudulently induced Trabue to make the trade although Trabue was incompetent to understand its true significance; that Trabue paid Kramer and Wade $400 for acting as his agent in the transaction; that Kramer took a judgment against Trabue on the judgment note for $3500 on October 1, 1928, and ten days later procured from Trabue quit-claim deeds to all of the nine tracts of land which Kramer had previously transferred to Trabue; that in the deeds from Kramer to Trabue the latter had assumed the payment of the building and loan association mortgages against the property and there was no equity left in the property above the total amount of these mortgages. The bill further alleges that all these transactions between Kramer and Trabue were fraudulent and invalid because of the fiduciary relation then existing between the parties.

To properly understand the relations of the different parties at the time of the transaction between Kramer and Trabue it is necessary for us to review some of Trabue's previous transactions.

The evidence taken before the master shows that up to about eight or nine years prior to his death Trabue was engaged in farming; that about 1920 he sold a farm near Jerseyville for over $60,000 and afterwards sold or exchanged another 160-acre farm for property in St. Louis; that soon after he sold the first mentioned farm he employed T. A. Gardner, a real estate dealer in St. Louis, as his agent, and through Gardner he bargained for some real estate at Broadway and Wright street, in St. Louis. At the time Trabue was supposed to have acquired title to this St. Louis property there was a second deed of trust on it for $8000, on which Trabue then paid $3000 and at a later time delivered to Gardner $5000 in bonds with which to pay off the remainder. Trabue supposed that the proceeds of these bonds had been applied as he had directed some two years prior to the transactions in this suit. In

the latter part of August, 1928, William F. Wade and J. W. Whitlock, claiming to represent Norman Staats, of Greene county, entered into negotiations with Trabue for the exchange of 600 acres of land in Greene county then owned by Staats, which was then subject to mortgage indebtedness, back taxes, etc., in an amount exceeding $46,-000. At that time foreclosure proceedings were pending in the Greene county circuit court on the mortgages covering this land. As a result of these negotiations, on August 31, 1928, a contract was drawn up by Wade and signed by Trabue and Staats for the sale of this 600-acre tract to Trabue, and as part of this deal Trabue then executed a warranty deed conveying the St. Louis property located at Broadway and Wright street to Staats. At the time this deal was consummated no abstracts of title were furnished by either Trabue or Staats to show the condition of the title to the property involved in the exchange. For about one year prior to the date of this transaction Wade had had a desk in the real estate office of Kramer in Alton and for several months prior to that time had resided in one of the houses owned by Kramer which he afterwards conveyed to Trabue in the transaction consummated on September 14, 1928. Whitlock had a real estate office just across the street from the office of Wade and Kramer in Alton. Wade and Whitlock had previously been in partnership in the real estate business in Whitehall, and also in Jerseyville, before either of them moved to Alton. Staats testified that Wade and Whitlock represented him in the transaction involving the exchange of properties with Trabue; that as their compensation for their services he agreed to give them a one-third interest in the St. Louis real estate presumably owned by Trabue. After the deed had been made from Trabue to Staats for the St. Louis property Wade had a deed made out conveying an undivided one-sixth interest in the St. Louis property from Staats and wife to Kramer. On October 12, 1928, Wade discovered

that said Trabue had never owned the property located at Broadway and Wright street, in St. Louis, which he had attempted to convey to Staats, and that about the time the deed was made from Trabue to Staats this property had been sold at a foreclosure sale under the second deed of trust which Trabue supposed Gardner had paid off with the proceeds of $5000 in bonds which he had delivered to Gardner for that purpose. After the deal between Trabue and Staats was closed Wade was with Trabue frequently. He went with him to Greene county to file his deed to the 600-acre farm in Greene county for record and to undertake some adjustment of the delinquent taxes and interest on the mortgage indebtedness on this land, it being necessary for Trabue to pay about $7500 to stop foreclosure proceedings. It also appears that Wade, Whitlock and Staats went with Trabue to St. Louis a day or two after the contract was made with Staats to get the legal description of the St. Louis property to be inserted in the deed which Trabue had signed without such description at the time the contract was made. A new deed was made by Gardner in St. Louis which Trabue signed in lieu of the deed made in Jerseyville. On the 13th of September Wade and Whitlock came to Jerseyville to see Trabue about trading the Greene county land, and on that day they took him to Wood River to see a Mr. Gerson. Wade testified that Gerson was not interested in making a deal for the Greene county land and they took Trabue back to Jerseyville; that "we were feeling around, so to speak, to satisfy him." The next morning, September 14, Whitlock and Trabue went to Kramer's office about nine o'clock. Wade testified that he did not know they were coming and had not said anything to Trabue about Kramer having any property to trade. Wade further testified that he (Wade) did not have any interest in the deal and did not represent anybody, but that after they had talked to Kramer about making an exchange, Wade, Whitlock, Kramer and Trabue

went to look at the farm near Godfrey, being the 140-acre farm described as tract No. 1 in the bill. At that time this farm was subject to two mortgages, one for $6000 and one for $4000. After looking at that farm they came back to Alton for lunch and then went to look at the different pieces of property in Alton and Wood River and were back at Kramer's office by three o'clock and the trade was finally consummated. Wade testified that at the time this deal was made Kramer had never seen the 600-acre farm. No abstracts of title were furnished to any of the property involved. The deeds were all made in Kramer's office on the same day the parties first looked at the property. At the same time Kramer also drew up a deed of trust securing the note for $10,000 on the 140-acre Godfrey farm, which Trabue signed. Then Trabue gave Kramer a judgment note for $3500 and a check for $3500 on the Jersey State Bank of Jerseyville, and also authorized Kramer to handle the Alton and Wood River properties and collect the rents. The next day, September 15, Wade and Kramer went to Jerseyville and cashed the check for $3500. The deeds which Kramer executed to Trabue were not filed for record until September 17. At the time the deal was consummated Trabue had no money on hand to pay the $3500 check he had given to Kramer, and in order to take care of it he secured a loan from the Jersey State Bank on a note signed by himself and his sister, Mrs. Andrews, for $3500.

Prior to the time Trabue made the deal with Kramer some real estate dealers from Springfield and Roodhouse had been to see him about a trade for the Greene county farm, in which they represented that they could make a trade and in some way secure $30,000 for Trabue. After the deal with Kramer these same parties came back to Trabue with an offer to deal for the properties he had acquired from Kramer, but then represented that they could not secure more than $20,000 in cash for his equities in the property he received from Kramer. These parties came

to Jerseyville and saw Trabue at his residence and had some conversation with him, then took him to Roodhouse and there induced him to make deeds conveying all of the real estate which he acquired from Kramer, and also a bill of sale for the $1500 personal property, in exchange for a deed conveying 160 acres of land in Texas. Soon after this occurred, and before the deeds which Trabue had made were put on record, Trabue re-conveyed to Kramer all the various tracts which he had previously acquired from Kramer, and these last mentioned deeds were filed for record before the deeds to the Springfield parties were recorded. It was also at this time that Wade made the discovery that Trabue never had any title to the St. Louis property and that it had been sold under a foreclosure proceeding on the second deed of trust prior to the time Trabue conveyed it to Staats. Wade immediately communicated with Trabue, who was very much disturbed to find that he had been duped, and agreed to go to St. Louis immediately and see Gardner and get the matter straightened out. A day or so later, Trabue, Wade, Whitlock, Kramer and Staats went to St. Louis, and instead of taking Trabue to see Gardner they left him at the Orpheum Hotel, across the street from Gardner's office. According to Wade's testimony Gardner and Trabue met that day only by accident. Nothing was accomplished by these parties on that trip and the title to the St. Louis property was never straightened out.

Without further recital, we think the evidence clearly discloses that for more than two years prior to his death Trabue possessed insufficient mental capacity to protect himself in a real estate trade and that in his deals with Kramer on September 14, 1928, an unfair advantage was taken of him. Trabue's weakened mental condition made him an easy prey for those who dealt with him. He did not have the benefit of legal or other advice and was at the mercy of those whom he trusted and to whom he actually paid $400 cash as commissions for assisting him. As

a result, Trabue at the time of his death had lost title to all of the property which was involved in this trade. He was out $7000, (cash and note,) had paid $400 commission, had assumed liabilities on the Alton and Wood River properties of $12,600, and had given Kramer his note for $10,000 secured by trust deed on the 140-acre farm. Kramer then held title to all of the property he originally owned, had $3500 in cash, $3500 in a note which he put in judgment and under which he had sold the $1500 of personal property on the farm formerly traded to Trabue, and in addition had $1000 received for his equity in the 600-acre farm afterwards re-conveyed to Staats.

Trabue's mental incapacity is amply shown in his transaction with Gardner in St. Louis. In that deal he paid little or no attention to the manner in which his business was being conducted and was fleeced out of $8000 without ever getting title to the property he was supposed to own. The evidence further showed that Wade and Whitlock knew of Trabue's operations in St. Louis and that Kramer also knew of this deal. Wade's denial that he had any interest in the Kramer-Trabue deal is also contradicted by the evidence. Wade was with Trabue, Kramer and Whitlock from nine o'clock in the morning of September 14 until the deal was closed and the deeds and mortgages executed that afternoon. The next morning Wade went with Kramer to Jerseyville to get the $3500 check cashed. While one witness testified that Wade was then employed by Kramer, the evidence is uncontrovertible that Wade received $250 commission from Trabue for his services in the first deal when Staats traded the 600-acre farm to Trabue, and afterwards, as Trabue's agent in the deal with Kramer on September 14, received four checks, aggregating $150, from Trabue. All this time Wade had office space with Kramer in Alton. In a case involving similar circumstances (*Hinkley* v. *Wynkoop,* 305 Ill. 115,) this court said: "A presumption arises against the validity of the transaction in a

case where real mental weakness of one of the parties is shown, and the burden of proof in such case rests upon the party claiming the benefit of the conveyance or of the contract to show its perfect fairness and the capacity of the other party. In this case the transaction is shown to be very unfair and the mental condition of appellee to be very bad. Where mental weakness of one party to a transaction, not of itself sufficient to destroy capacity, is accompanied by undue influence, inadequacy of price, advantage taken of pecuniary necessities, ignorance and want of advice, misrepresentations or concealment, and the like, a contract or conveyance procured under such combined conditions will be defeated or set aside. It is not simply a presumption of invalidity which thus arises, but the presumption has become established."

Applying the test announced above, the transaction between Kramer and Trabue was clearly the result of the impaired mentality of Trabue and his inability to comprehend the nature and effect of the transaction. He had no benefit of counsel or advice and no time was taken to examine the titles to and liens against the nine different tracts of real estate. He blindly assumed the mortgage obligations against this property without investigation of any kind. The mere fact that the grantor comprehended that he was making a deed is not in itself sufficient to sustain the transaction. (*Greene* v. *Maxwell*, 251 Ill. 335.) Mental strength to compete with an antagonist and understanding to protect his own interest are essential in the transaction of ordinary business. (*Ring* v. *Lawless*, 190 Ill. 520.) To make a valid contract each party must not only be of sufficient mental ability to appreciate the effect of what he is doing but must also be able to exercise his will with reference thereto. (*Weller* v. *Copeland*, 285 Ill. 150; *Heiligenstein* v. *Schlotterbeck*, 300 id. 206.) It seems clear from the evidence that Trabue did not have the mental strength sufficient to fully comprehend the nature of his

transaction with Kramer or to protect his own interests in the deal. He lacked capacity to comprehend the value of what he was conveying and the liabilities he was assuming and thus could not determine whether he would be benefited or injured in the transaction.

In behalf of Kramer it is contended that the equities in the Alton and Wood River properties traded to Trabue are worth from $13,000 to $16,000, for which Kramer only received $8000 in note and cash from Trabue—in other words, that Kramer lost from $5000 to $8000 in the deal. If this was true the decree of the circuit court restoring the parties to their original position works a benefit, rather than an injury, to Kramer. We are satisfied that the decree of the circuit court was adequately supported by the evidence and should be affirmed.

In view of our conclusion that Trabue lacked sufficient mental capacity to enter into a valid contract with Kramer it will not be necessary for us to consider whether a fiduciary or confidential relation existed between the parties.

The plaintiffs in error's contention that the findings of the master in chancery, based upon conflicting evidence, should not be disturbed on appeal is without merit in a case of this character. The master's report, while *prima facie* correct, is of an advisory nature, only, and does not have the force of a jury verdict in a suit where trial by jury is a matter of right. The facts in a chancery case are open for consideration in the first instance by the trial court, and in case of an appeal by the reviewing court. *Kelly* v. *Fahrney,* 242 Ill. 240; *Chechik* v. *Koletsky,* 311 id. 433; *Union Bank* v. *Gallup,* 317 id. 184.

For the reasons stated above the decree of the circuit court is affirmed.

*Decree affirmed.*