Rule 23 order filed
January 25, 2023.
Motion to publish granted
February 17, 2023.

2023 IL App (5th) 210391

NO. 5-21-0391

IN THE

## APPELLATE COURT OF ILLINOIS

## FIFTH DISTRICT

---

| | | |
|---|---|---|
| THERESA A. SOLOMON, as Guardian of the Estate of Megan Leigh Farmer, a Disabled Person, and Julia Lotus Farmer, a Minor, | ) ) ) ) | Appeal from the Circuit Court of Jackson County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 13-L-63 |
| CENTER FOR COMPREHENSIVE SERVICES, INC., d/b/a NeuroRestorative Illinois and NeuroRestorative Carbondale; NAOMI BOOKER; DARCY KRIEGSMAN; ELBERT FASNACHT, M.D.; ELBERT FASNACHT, II, M.D., LTD.; RHONDA MELVIN, R.N.; D. DOUGLAS STROBEL; and JOSEPHSON, WALLACK, MUNSHOWER NEUROLOGY, P.C., | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants and Counterplaintiffs-Appellees, | ) ) ) | |
| v. | ) ) | |
| JAMEY A. CARLSON, | ) ) | Honorable Christy W. Solverson, |
| Counterdefendant. | ) | Judge, presiding. |

---

JUSTICE CATES delivered the judgment of the court, with opinion.
Presiding Justice Boie and Justice Barberis concurred in the judgment and opinion.

## OPINION

¶ 1    The plaintiff, Theresa Solomon, as guardian of the estates of Megan Leigh Farmer, a

disabled person (Megan), and Julia Lotus Farmer, a minor (Julia), brought a personal injury action

1

against the defendants, Center for Comprehensive Services, d/b/a NeuroRestorative Illinois and NeuroRestorative Carbondale (NeuroRestorative); Naomi Booker; Darcy Kriegsman; Rhonda Melvin, R.N.; Elbert Fasnacht, M.D.; Elbert Fasnacht, II, M.D., Ltd.; D. Douglas Strobel, M.D.; and Josephson, Wallack, Munshower Neurology, P.C. (JWM Neurology),[1] based upon theories of medical negligence, transferred negligence, and negligent supervision. The trial court dismissed the claims against Dr. Strobel and JWM Neurology for lack of personal jurisdiction and granted summary judgments for the remaining defendants on the claims for transferred negligence and negligent supervision. The plaintiff appeals those rulings. We affirm in part and reverse in part.

¶ 2                                I. BACKGROUND

¶ 3     This action was originally filed in October 2012, by Jamey Carlson, as guardian of her daughter, Megan, against NeuroRestorative. In February 2016, Theresa Solomon was substituted as the nominal plaintiff. Solomon is the grandmother of Megan and the great-grandmother of Julia. Over the course of the litigation, the complaint has been amended several times, and the record is lengthy. An overview of the evidence taken from the pleadings, depositions, and discovery materials on file follows.

¶ 4     Megan Farmer was born August 27, 1986. Jamey Carlson and Tim Farmer are Megan's parents. On August 27, 1995, Megan suffered a traumatic brain injury after being hit by a car. Megan received medical care and seemed to be recovering from her injuries. As Megan entered her early teens, Jamey noted changes in Megan's cognitive abilities, behavior, and judgment. Megan "zoned out" at times, and acted out at others. Megan had sexual relations with a classmate and became pregnant when she was 16 years old. She miscarried early in the pregnancy. Because

---

[1]At the trial level and on appeal, NeuroRestorative, Naomi Booker, Darcy Kriegsman, and Rhonda Melvin, R.N., were referred to collectively as "the NeuroRestorative defendants." For consistency, that designation has been retained in this decision.

of Megan's ongoing mental health struggles, Jamey took Megan out of school after the tenth grade. At that time, Megan's symptoms included staring spells followed by periods of confusion, deterioration in cognitive functioning and judgment, and occasional acts of aggression.

¶ 5    In September 2006, Megan started seeing Dr. Douglas Strobel at his offices in Indiana. Dr. Strobel diagnosed Megan with a traumatic brain injury and a seizure disorder. He placed Megan on trials of several medications, none of which was particularly effective.

¶ 6    In October 2007, Megan was admitted to an Indiana hospital after she attempted to assault her mother. Dr. Anne Gilbert, a psychiatrist, evaluated Megan. Dr. Gilbert noted that Megan was avolitional, amotivational, and socially withdrawn. Megan had to be "cued" to perform basic personal hygiene. Dr. Gilbert also noted that Megan "had no abstract reasoning whatsoever." Megan responded to questions with "yes or no" answers. She was able to provide simple factual answers, but without elaboration. For example, Megan could name her medications, but she could not explain why she was taking them.

¶ 7    Dr. Gilbert prescribed Ativan and Depakote for Megan. Depakote is an anti-epileptic drug, prescribed for seizure disorders, bipolar disorders, and other neurologic conditions. Dr. Gilbert testified that Depakote carried a "Black Box Warning,"[2] advising of the serious risk of birth defects, particularly spina bifida, when Depakote was taken during pregnancy. Dr. Gilbert testified that she typically discussed Depakote's risks of birth defects with patients who were of childbearing age. In Megan's case, however, Dr. Gilbert discussed these risks with Megan's mother because Megan was not able to process that information. Dr. Gilbert testified that she had no discussions with Megan's mother regarding a power of attorney or guardianship during

---

[2]Black Box Warnings, also called "boxed warnings," are the FDA's most stringent warnings for drugs and medical devices in marketplace. Black Box Warnings are intended to alert the public and health care providers that certain medications carry serious adverse reactions, such as injury or death.

Megan's hospital stay. Dr. Gilbert also testified that she did not think Megan could have made decisions about medications on her own. She thought Megan would have needed a guardian. Dr. Gilbert provided only inpatient treatment. Megan was discharged with instructions to follow up with Dr. Strobel.

¶ 8 Dr. Strobel saw Megan after she was discharged from the hospital. Dr. Strobel decided to maintain Megan on Depakote because it was effective. He advised Megan and her mother that Megan should not get pregnant while she was taking Depakote. He also advised them that Megan should take a vitamin supplement called folate, but he did not prescribe any form of birth control for Megan. Dr. Strobel admitted that he did not warn Megan or her mother specifically about an increased risk of birth defects in the babies of women who took Depakote while pregnant. He explained that he ordinarily advised his patients to take folate and exercise family planning while on Depakote. He did not inform his patients about the specific risks of spina bifida and other birth defects associated with Depakote because he did not want to "poison the well." He noted that some patients would refuse to take the drug because of the potential side effects. From time to time, Dr. Strobel had conversations with Megan's mother, Jamey, about switching Megan from Depakote to another medication, but Jamey resisted.

¶ 9 Dr. Strobel clarified that when he testified that he had conversations with Megan, those conversations were with Jamey. He described Jamey as the "responsible party" and "very directive" in Megan's care. Dr. Strobel recognized that Megan was of legal age and entitled to make decisions, and also that she had a brain injury, and she was not interacting with her surroundings. In 2012, at Jamey's request, Dr. Strobel prepared a report indicating that Megan did not have the mental capacity to make medical decisions for herself. Dr. Strobel testified that he had not recommended a guardianship for Megan prior to 2012, because Jamey was in "a

4

supervisory role." There was, however, within Dr. Strobel's records, a prescription form dated October 13, 2006, on which Dr. Strobel noted that Megan lacked "the capacity for decision-making and self-determination."

¶ 10    In 2010, Jamey discovered that NeuroRestorative offered inpatient brain-injury rehabilitation and independent living programs in Carbondale, Illinois. Jamey asked Dr. Strobel to write a letter of medical necessity to Indiana Medicaid so that she could secure insurance coverage for the rehabilitation program. In May 2010, and again in August of 2011, Dr. Strobel wrote letters to the Indiana Medicaid Prior Authorization Unit to request authorization and Medicaid coverage. He did not consult with anyone from NeuroRestorative regarding Megan's admission to the program.

¶ 11    On October 11, 2011, Megan was admitted to NeuroRestorative's facility in Carbondale, Illinois. Megan, then 25 years old, signed admissions paperwork, including an admissions agreement. The admissions agreement included a waiver of liability. The waiver provided that the participant agreed to release NeuroRestorative from any and all liability for the resultant consequences of the participant's decision to voluntarily engage in certain activities, including unprotected sexual activity.

¶ 12    The NeuroRestorative records included admissions notes, dated October 10, 2012, and a "participant overview profile," dated October 19, 2012. In the records, Megan was identified as her own guardian, and Jamey was identified as "closely involved." Megan's barriers and challenges included: impairment of executive functioning; lack of insight, judgment, and initiative; poor problem solving, distractibility, and memory; and lack of safety in community settings. Megan was at risk of being victimized by others, easily led, and prone to exploitation by peers. The records also identified areas to pay attention to, and these included "potential issues with peers

5

(males)," exploitation by others, and personal safety skills. As part of the treatment plan, Megan was permitted to be independent "up to 4 hours per day with intermittent supervision and safety plans in place." Megan was not under 24-hour supervision because the staff tried to afford all participants some level of privacy.

¶ 13　The NeuroRestorative records also contained a written report of a psychiatric evaluation performed by Dr. Claudia Kachigian on October 21, 2011. In the report, Dr. Kachigian noted that Megan had undergone a neuropsychological evaluation on July 20, 2011, that indicated severe executive function impairment, disinhibition, verbal memory disturbance, mild depression, and anxiety. Dr. Kachigian performed a mental status evaluation on Megan. Dr. Kachigian found that Megan was mildly disheveled with good eye contact. Megan had a blunted demeanor with an occasional smile, very slow and soft speech, and difficulty formulating her thoughts and responses. Megan's judgment and insight appeared impaired, but she was oriented to time, place, date, and situation. Dr. Kachigian found nothing that called for an adjustment to Megan's medications.

¶ 14　At the time of Megan's admission, Dr. Elbert Fasnacht was the medical director and primary care physician at NeuroRestorative. Dr. Fasnacht continued to prescribe Depakote and Ativan for Megan. He deferred to Dr. Strobel's decision to prescribe Depakote, noting that it would be dangerous to suddenly change someone's seizure medication. Dr. Fasnacht knew about the risks of birth defects associated with Depakote. He did not talk with Megan about Depakote's risks of birth defects. He thought Dr. Strobel would have warned her about those risks. Dr. Fasnacht did not prescribe any form of birth control for Megan.

¶ 15　Rhonda Melvin, R.N., was Megan's medical manager. Upon Megan's admission to the rehabilitation program, Melvin did not talk with Megan about the risks and benefits of Megan's medications. Melvin did not think Megan was capable of managing medications on her own. She

6

noted that Megan had not previously managed her own medications and would need to be trained on how to take them. Melvin did not recall talking with Megan and her mother specifically about Depakote's risk of birth defects. She expected that the prescribing physician would have warned about those risks. Melvin recalled one conversation in which she advised Megan that seizure medications have bad effects on babies and that if Megan wanted children, that would need to be planned and monitored closely by a doctor. Melvin acknowledged that she did not document that conversation in her assessment notes, and she could not recall when the conversation occurred.

¶ 16     In early November 2011, Melvin, Darcy Kriegsman (Megan's case manager), and Naomi Booker (residential supervisor) became aware of Megan's apparent interest in some of the male residents. Melvin met with Megan and advised her about the interpersonal conflicts that could arise from engaging in sexual activity with other residents as well as the risks of unprotected sexual activity. At that time, Megan indicated that she was not sexually active and that she did not want birth control. By March 2012, the NeuroRestorative staff was aware that Megan had been sneaking out of her room, and that she was romantically involved with a male peer. Melvin met with Megan again. Megan acknowledged the relationship, but denied that they had been sexually active. Megan also requested an OB/GYN consult.

¶ 17     On April 9, 2012, Megan visited Planned Parenthood. She received a Depo-Provera injection, but she did not have a pregnancy test. On April 23, 2012, Megan was discharged from NeuroRestorative. On August 16, 2012, Megan had a positive pregnancy test. On November 12, 2012, Megan gave birth to a baby girl, Julia Farmer. Julia was born with spina bifida and other health problems.

¶ 18     Megan was deposed on August 20, 2019. At that time, Megan was 32 years old and 7 years removed from her stay at NeuroRestorative. During the deposition, Megan gave short answers to

simple and sometimes leading questions. She often answered questions with "uh-huh" and "huh-uh," and "yeah" or "no," without elaboration. Megan was able to recite her own date of birth and the date of birth of her daughter, Julia. Megan testified that she lived with her parents, and that she helped take care of Julia. She stated that when she awoke in the morning, she showered and sometimes made her own breakfast. She stated that her medication was kept in her dad's room, and that she was able to take it on her own.

¶ 19    Megan stated that she went to NeuroRestorative for help with "her GED and stuff and getting things together." She recalled that she had to sign some documents when she first arrived. Megan was shown the waiver of liability document, and she identified her signature. Megan was asked to read aloud the words on the document, and she was able to do so. Megan was not questioned about the purpose of the document or to explain its meaning in her own words. Megan acknowledged that she had agreed to go to NeuroRestorative. She also stated she could leave if she wanted to and if her mother would sign her out. Later, she said that NeuroRestorative "had me sign papers and pretty much had my rights unless my mom came and got me."

¶ 20    Megan testified that Depakote had been prescribed for her about three or four years before she went to NeuroRestorative. Megan did not ask any questions about the medication. She recalled that her doctor said that if there was any family planning in the future, there should be a medication change. She knew that family planning meant if she was thinking about having children. She was not having sex, so she really did not remember it or think about it. Megan testified that the doctor never told her that Depakote could cause major birth defects. Megan was asked whether anyone from NeuroRestorative talked to her about not having sexual activities with others, and she replied, "Uh-huh." Megan said that the staff told her she should not have sexual activities with others, but they did not explain that Depakote could cause spina bifida. Megan was asked whether she knew,

8

while at NeuroRestorative, that if she had sex, she could become pregnant and she could risk getting a sexually transmitted disease. She answered, "yeah," without elaboration. When asked if she thought about those risks while she was having sex with her male peer, she replied, "Well, not really, no." "He was in a wheelchair, and I didn't really think that he's—he's been there in NeuroRestorative for a long time, so I didn't think that that was like a problem because he had been shot in the head and he's missing a leg."

¶ 21                                    The Litigation

¶ 22    On October 12, 2012, Jamey Carlson, as guardian of Megan Farmer,[3] filed a one-count complaint against NeuroRestorative. The plaintiff alleged that NeuroRestorative, by and through its authorized agents, breached its duty to adequately supervise and thereby prevent Megan and other residents from engaging in sexual activity, and that as a result of the defendant's breach of duty, Megan became pregnant and suffered physical and emotional injuries. The case was originally filed in Cook County, Illinois. It was transferred to Jackson County, Illinois, on May 15, 2013, pursuant to defendant's *forum non conveniens* motion. Since then, the complaint has been amended several times, with the addition of new parties and new causes of action. The seventh and eighth amended complaints are at issue here.

¶ 23    On November 9, 2017, Theresa Solomon, as guardian of the estates of Megan Farmer, a disabled person, and Julia Farmer, a minor,[4] filed the seventh amended complaint against the

---

[3]On October 12, 2012, Jamey Carlson was appointed as Guardian of the Estate and Person of Megan Farmer, a disabled adult, by the Marion Superior Court in Indianapolis, Indiana. Prior thereto, Jamey had been acting as Megan's temporary guardian, pursuant to a preliminary order, entered August 22, 2012.

[4]On December 7, 2015, Solomon was appointed to serve as guardian of the estates of Megan and Julia by the Marion Superior Court. In February 2016, Solomon was substituted as the nominal plaintiff. The substitution was made when third-party contribution claims were filed against Jamey Carlson.

NeuroRestorative defendants, Elbert Fasnacht, M.D., and Elbert Fasnacht, II, M.D., Ltd.[5] The first three counts were brought on behalf of Julia under a theory of transferred negligence. In count I, the plaintiff alleged that Dr. Fasnacht breached his duty to Megan, and deviated from accepted standards of medical care in that he improperly prescribed Depakote to Megan, a woman of childbearing age who was not on contraception and who was suspected of being sexually active, without informing her of Depakote's risks of birth defects; failed to communicate with Rhonda Melvin, R.N., about Megan's sexual activities; failed to timely prescribe birth control and folic acid for Megan; and failed to timely provide or refer Megan for appropriate prenatal care. In count II, the plaintiff alleged that Rhonda Melvin, R.N., breached her duty to Megan and deviated from accepted standards of nursing care and medical management in that she improperly administered Depakote to Megan, a woman of childbearing age who was not on contraception and who was suspected of being sexually active, without adequately informing her of Depakote's risks of birth defects; failed to communicate with Dr. Fasnacht about Megan's sexual activities; and failed to provide adequate medical supervision and timely referral of Megan for appropriate prenatal care. Count III was brought against NeuroRestorative, alleging vicarious liability for the negligence of its agents or apparent agents. In all three counts, the plaintiff alleged that as a proximate result of the defendants' negligence, Megan became pregnant and gave birth to Julia, a baby born with spina bifida and other birth defects; that Julia's injuries were proximately caused by in utero exposure to Depakote; and that Julia's injuries were foreseeable consequences of the defendants' negligent treatment of Megan.

---

[5]Dr. Fasnacht was the agent and/or employee of Elbert Fasnacht, II, M.D., Ltd., and the counts against the corporate entity were brought under a theory of vicarious liability. Therefore, we will refer to these defendants "collectively" as Dr. Fasnacht.

10

¶ 24    The plaintiff also brought medical negligence claims on behalf of Megan and against Dr. Fasnacht (count IV), Nurse Melvin (count V), and NeuroRestorative (count VI), alleging the same respective acts and omissions set forth in the counts I, II, and III. The plaintiff further alleged that as a proximate result of the defendants' negligence, Megan became pregnant and gave birth to a baby with spina bifida and other birth defects. The plaintiff claimed that Megan suffered physical and emotional injuries, and other damages as a proximate cause of the defendants' negligence.

¶ 25    In addition, the plaintiff brought negligence supervision claims on behalf of Megan and against NeuroRestorative (count VII), Darcy Kriegsman (count VIII), and Naomi Booker (count IX). The plaintiff alleged that the defendants knew or should have known that Megan and a male peer were having a sexual relationship. The plaintiff further alleged that the defendants failed to properly monitor and supervise Megan and the male peer who impregnated Megan; failed to inform Dr. Fasnacht that Megan was sexually active or had an interest in becoming sexually active; and improperly relied upon Megan to make decisions regarding birth control. The plaintiff again claimed that Megan suffered physical and emotional injuries, and other damages as a proximate cause of the defendants' negligent supervision.

¶ 26    On April 20, 2018, the trial court dismissed the medical negligence claims filed on behalf of Megan and against Dr. Fasnacht (count IV) and Nurse Melvin (count V) based upon a failure to state a cause of action for wrongful birth. The court noted that wrongful birth was a distinct cause of action in which parents allege that a medical provider was negligent in providing genetic counseling or prenatal testing, and that as a result, they were foreclosed from making an informed decision about whether to conceive a child, or in the event of pregnancy, whether to carry that pregnancy to term. The court found the plaintiff made no such allegations against Dr. Fasnacht

11

and Nurse Melvin. In a "corrected" order, the court dismissed the wrongful birth claim (count VI) against NeuroRestorative for the same reasons.

¶ 27    On June 9, 2020, the NeuroRestorative defendants filed a motion for summary judgment as to all remaining counts of the seventh amended complaint. The NeuroRestorative defendants argued that Julia's claims based upon transferred negligence could not stand because her mother's medical negligence/wrongful birth claims had been dismissed by the trial court. They also claimed that they were entitled to judgment as a matter of law on Megan's negligent supervision claims because Megan voluntarily signed a form, waiving liability for the resultant consequences of unprotected sexual activity, and because Megan's engagement in unprotected sexual activity while on Depakote constituted a superseding and intervening cause of her pregnancy.

¶ 28    On June 22, 2020, Dr. Fasnacht filed a motion for summary judgment and joined in all but one of the points made by NeuroRestorative. Dr. Fasnacht declined to adopt NeuroRestorative's waiver argument because the waiver did not apply to him.

¶ 29    The plaintiff filed a response in opposition to the defendants' motions for summary judgment. In addressing transferred negligence, the plaintiff argued that Megan and Julia had a special relationship as mother and child, and that it was reasonably foreseeable that Megan could become pregnant and give birth to a child with spina bifida as a result of the defendants' negligent acts and omissions. The plaintiff also argued that Julia had a right to file a claim for her own damages even if Megan chose not to pursue a separate claim for damages. In addressing the waiver argument, the plaintiff claimed there were genuine issues of material fact as to whether Megan was competent to execute the waiver, whether Megan had the capacity to understand the waiver, and whether Megan had voluntarily engaged in unprotected sexual activity. The plaintiff also claimed that there were genuine disputes regarding whether the waiver was against public policy

and whether it clearly and unequivocally covered the particular circumstances of the case. As to the proximate cause arguments, the plaintiff claimed that Megan's engagement in unprotected sexual activity did not break the chain of causal connection because Megan had not been adequately informed about Depakote's risks of birth defects.

¶ 30    While the motions for summary judgment were pending, the plaintiff was granted leave to amend her complaint. In the eighth amended complaint, the plaintiff reasserted the claims for transferred negligence and negligent supervision.[6] Additionally, the plaintiff brought medical negligence and transferred negligence claims against Dr. Strobel and his employer, JWM Neurology (collectively, the Strobel defendants).[7]

¶ 31    The Strobel defendants moved to dismiss the claims against them for lack of personal jurisdiction. They argued that neither Dr. Strobel nor JWM Neurology had sufficient contacts within the State of Illinois to subject them to the jurisdiction of the Illinois courts. The motion was supported by affidavits from Dr. Strobel and Herschal F. Jacquay, executive director of JWM Neurology. Dr. Strobel averred that he did not have any offices in Illinois, that he did not practice medicine in Illinois, that all of the care he provided to Megan occurred in Indiana, and that he provided no care to Megan while she was a resident of NeuroRestorative. Jacquay averred that JWM Neurology was incorporated in Indiana, and that it maintained several offices in Indiana, but no offices in Illinois. Jacquay further averred that JWM Neurology had no business connections in Illinois and did not promote or target advertising in Illinois.

---

[6]The plaintiff also included the medical negligence/wrongful birth claims against Dr. Fasnacht and Nurse Melvin that had been previously dismissed by the court. The plaintiff indicated that this was done to preserve the record.

[7]The medical negligence claims against JWM Neurology were based on a theory of vicarious liability.

13

¶ 32    In response, the plaintiff claimed that personal jurisdiction was proper under subsection (c) of the Illinois long-arm statute (735 ILCS 5/2-209(c) (West 2020)), because the Strobel defendants purposefully directed their activities in Illinois, and the medical negligence action against them arose from those activities. The plaintiff argued that Dr. Strobel prescribed Depakote for Megan without advising her of the risks of serious birth defects, that he recommended that Megan attend the NeuroRestorative program in Illinois, and that he knew or should have known that his medical decisions would form the basis for further treatment in Illinois.

¶ 33    On April 20, 2021, the trial court dismissed all claims against the Strobel defendants based upon a lack of personal jurisdiction. The court found that the plaintiff failed to make a *prima facie* showing that the Strobel defendants had sufficient minimum contacts with Illinois to satisfy due process concerns.

¶ 34    On November 12, 2021, the trial court entered summary judgment on the transferred negligence counts in favor Dr. Fasnacht, Rhonda Melvin, R.N., and NeuroRestorative. The court also entered summary judgment on the negligent supervision counts in favor of the NeuroRestorative defendant. This appeal followed.

¶ 35                                 II. ANALYSIS

¶ 36                    A. Personal Jurisdiction—The Strobel Defendants

¶ 37    Initially, we consider whether the trial court erred in dismissing the claims against the Strobel defendants for lack of personal jurisdiction. A plaintiff has the burden to establish a *prima facie* basis for exercising personal jurisdiction over a nonresident defendant. *Russell v. SNFA*, 2013 IL 113909, ¶ 28. Where, as here, the trial court's decision is based solely upon the pleadings and documentary evidence, without an evidentiary hearing, the decision is reviewed *de novo*. *Russell*, 2013 IL 113909, ¶ 28.

14

¶ 38    The exercise of personal jurisdiction over a nonresident defendant by an Illinois court is authorized under the Illinois long-arm statute. See 735 ILCS 5/2-209 (West 2020). Subsection (c) of the long-arm statute, commonly referred to as the "catch-all provision," provides that a court may exercise jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2020). Under the "catch-all provision," the issue is whether a nonresident defendant's contacts with Illinois are sufficient to satisfy federal and Illinois due process standards. *Russell*, 2013 IL 113909, ¶ 30. The Strobel defendants have not argued that the Illinois Constitution provides more due process protections than the federal constitution on the issue of personal jurisdiction. Therefore, we will not consider due process principles under Illinois law separately from federal due process principles. *Russell*, 2013 IL 113909, ¶ 33.

¶ 39    Under federal due process principles, a state court may exercise personal jurisdiction over a nonresident defendant if the defendant has "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citation.]" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The "minimum contacts" required for personal jurisdiction differ depending upon whether general jurisdiction or specific jurisdiction is asserted. *Russell*, 2013 IL 113909, ¶ 36.

¶ 40    General jurisdiction is considered "all-purpose." *Aspen American Insurance Co. v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 14. General jurisdiction exists when the nonresident defendant's contacts with the forum state are so " 'continuous and systematic' as to render [him] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *International Shoe*, 326 U.S. at 317). When general

jurisdiction exists, the plaintiff may pursue a claim against a defendant even if the defendant's challenged conduct occurred outside of the forum state. *Aspen American*, 2017 IL 121281, ¶ 14.

¶ 41 Specific jurisdiction is "case-specific." *Aspen American*, 2017 IL 121281, ¶ 14. It exists when a plaintiff's cause of action arises out of or relates to a defendant's contacts with the forum state. *Aspen American*, 2017 IL 121281, ¶ 14. A court may exercise specific jurisdiction over a nonresident defendant if the defendant has "purposefully directed" his activities at the forum's residents and the cause of action arose out of or related to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). There must be " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The "purposeful availment" requirement protects a nonresident defendant from being brought into a jurisdiction based on random or attenuated contacts or the unilateral activity of another person. *Burger King*, 471 U.S. at 475. Only specific jurisdiction is at issue here.

¶ 42 The record shows that Dr. Strobel was a physician licensed in Indiana, that he was an employee or agent of JWM Neurology, that his medical office was located in Indiana, and that his contacts with Megan Farmer occurred at his office in Indiana. The record also shows that JWM Neurology was an Indiana corporation, that its offices were located in Indiana, and that it had no offices in Illinois. Herschal F. Jacquay, executive director of JWM Neurology, submitted an affidavit stating that the Strobel defendants did not target advertising to Illinois residents or otherwise promote their business in Illinois.

¶ 43 There is no evidence indicating that the Strobel defendants had a business relationship with NeuroRestorative, or that they referred Megan or any other patients to NeuroRestorative. Jamey

16

Carlson, Megan's mother, testified that she made the initial contact and the arrangements for Megan's admission to the NeuroRestorative program in Carbondale, Illinois. At Jamey's request, Dr. Strobel wrote two letters to the Indiana Medicaid Preauthorization Unit, asking that Indiana Medicaid provide insurance coverage for Megan's care at NeuroRestorative. Dr. Strobel treated Megan at his offices in Indiana. He did not treat Megan while she was at the NeuroRestorative facility in Illinois. He did not consult with Dr. Fasnacht or any other agent or employee of NeuroRestorative about Megan's admission to the program or Megan's care while she participated in the program. Additionally, all of the alleged negligence by Dr. Strobel occurred in Indiana.

¶ 44    Based upon this record, the plaintiff failed to make a *prima facie* showing that the Strobel defendants had sufficient minimum contacts with Illinois to establish specific personal jurisdiction. The plaintiff did not establish that the Strobel defendants purposefully directed their activities toward Illinois residents and that the cause of action arose out those activities. Accordingly, the trial court did not err in dismissing the claims against the Strobel defendants for lack of specific personal jurisdiction.

¶ 45                      B. Summary Judgment—Transferred Negligence

¶ 46    Next, we consider whether the trial court erred in granting summary judgment in favor of Dr. Fasnacht and the NeuroRestorative defendants on the transferred negligence claims filed on behalf of Julia. The plaintiff argues that the trial court improperly applied the law of transferred negligence, as set forth in *Renslow v. Mennonite Hospital*, 67 Ill. 2d 348 (1977), in analyzing those claims. The plaintiff also argues that there are genuine issues of material fact regarding whether the defendants breached a duty of care to Megan, and whether that breach was a proximate cause of Julia's injuries.

17

¶ 47 Summary judgment is appropriate only when the pleadings, depositions, admissions, exhibits, and affidavits on file, viewed in a light most favorable to the nonmoving party, show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020). The purpose of summary judgment is not to try an issue of fact, but to determine whether a triable issue of fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). When considering whether a genuine issue of material fact exists, the court must construe all pleadings and attachments strictly against the moving party and liberally in favor of the opposing party. *Adams*, 211 Ill. 2d at 43. A triable issue exists if there is a dispute concerning material facts, or, if those facts are undisputed, but reasonable persons might draw different inferences from the undisputed facts. *Adams*, 211 Ill. 2d at 43. The trial court's ruling on a motion for summary judgment is reviewed *de novo*. *Adams*, 211 Ill. 2d at 43.

¶ 48 To prevail on a cause of action for medical negligence, the plaintiff must establish the existence of a medical provider/patient relationship, the applicable standard of care against which the medical professional's conduct is measured, a deviation from the standard of care, and a resulting injury proximately caused by the deviation from the standard of care. *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986). The standard of care fits within the duty element of a cause of action, and requires that the medical professional act with the same degree of knowledge, skill, and ability as an "ordinarily careful professional" would act under similar circumstances. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 294-95 (2000). In a medical negligence case, expert testimony is ordinarily required to establish the standard of care, the deviation from that standard of care, and proximate cause. *Johnson v. Armstrong*, 2022 IL 127942, ¶ 53. Whether a medical professional deviated from the standard of care and whether that deviation was a proximate cause

18

of the plaintiff's injury are questions of fact for the factfinder. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423 (1975).

¶ 49     The Illinois Supreme Court recognized the concept of transferred negligence in *Renslow v. Mennonite Hospital*, 67 Ill. 2d 348 (1977). In *Renslow*, our supreme court held that a child, not conceived at the time negligent acts were committed against the child's mother by medical providers, had a cause of action against those medical providers for prenatal injuries the child sustained as a result of their negligent conduct. *Renslow*, 67 Ill. 2d at 357. The *Renslow* court noted that the law had long recognized that "a wrong done to one person may invade the protected rights of one who is intimately related to the first." *Renslow*, 67 Ill. 2d at 357. Applying that legal principle, the court found that the medical providers' duty to the patient should be transferred to her infant daughter because of the special, intimate relationship between the infant and her mother and because the injury to the infant was the direct result of the negligent treatment rendered to the mother. *Renslow*, 67 Ill. 2d at 357. The court concluded that the child had a right to be born free from prenatal injuries foreseeably caused by a breach of duty to the child's mother. *Renslow*, 67 Ill. 2d at 357.

¶ 50     In this case, it is undisputed that a special, intimate relationship existed between Megan and her daughter, Julia, and that Megan had patient/medical professional relationships with Dr. Fasnacht and Nurse Melvin. Both owed a duty to use the same degree of knowledge, skill, and ability that an ordinarily careful health care professional, in his or her respective field, would exercise under similar circumstances.

¶ 51     The parties do not agree on the proximate cause element of a transferred negligence claim. Dr. Fasnacht and Nurse Melvin argue that the plaintiff was required to establish that the defendants breached a duty owed to Megan, that the breach resulted in an injury to Megan, and that the breach

19

also resulted in an injury to Julia. They further argue that Megan's cause of action for "wrongful birth" was dismissed, and that absent a valid cause of action for Megan, there was no negligence to transfer to Julia. The plaintiff counters that under *Renslow*, the plaintiff is required to establish that the defendants breached a duty to the mother, and that the breach resulted in foreseeable injuries to the child.

¶ 52 The dispute between the parties centers on the nature of the "negligence" that is being transferred to Julia as the nonpatient third party. The word "negligence" is often used in the law to mean either (a) the cause of action or theory of liability, including all of its elements, or (b) the breach of a duty of care. See *Johnson*, 2022 IL 127942, ¶ 54. In a transferred negligence claim, it is the breach of the defendant's duty of care, *i.e.*, the act of negligence,[8] that is transferred. The breach of a duty owed to the mother is extended to the child because of the special and intimate relationship between mother and child, and because of a foreseeable injury to the child directly resulting from the negligent treatment rendered to the mother. *Renslow*, 67 Ill. 2d at 356-57. To prevail on a claim for transferred negligence, Julia must establish that the defendants owed and breached a duty of care to her mother, and that her injuries were a proximate result of that breach of duty. The child is not required to establish that her mother sustained an injury as a result of the negligent acts. The child may pursue her claim regardless of whether her mother pursues her own claim for damages. Unlike a derivative loss-of-consortium claim, a transferred negligence claim

---

[8]"Negligence" is defined as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." Black's Law Dictionary 1056 (7th ed. 1999). Our civil jury instructions provide, "When I use the word 'negligence' in these instructions, I mean the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide." Illinois Pattern Jury Instructions, Civil, No. 10.01 (approved Dec. 8, 2011). A medical professional's deviation from the standard of care or practice constitutes professional negligence. See Illinois Pattern Jury Instructions, Civil, No. 105.01 (approved June 24, 2020).

involves a claim for an injury to the child's person. The child's injuries are direct and distinct; they exist apart from any injury to the child's mother. In addition, we note that in some cases, a mother may not be able to demonstrate a sufficient or cognizable personal injury resulting from the negligent care, making an action on the mother's behalf unfeasible. That does relieve a defendant from liability for prenatal harm to the child foreseeably caused by a breach of duty to the child's mother.

¶ 53    Next, we consider whether the trial court erred in finding there was no breach of duty to Megan by Dr. Fasnacht and Nurse Melvin. In entering summary judgment, the trial court indicated it had previously held that there was no breach of duty to Megan, and therefore, negligence could not be transferred to Julia. In that previous ruling, entered on March 16, 2017, the trial court found that "wrongful birth" was a distinct cause of action, based upon a failure to provide prenatal testing or genetic counseling. The trial court dismissed Megan's claims for wrongful birth because the plaintiff did not allege that the defendants failed to provide genetic counseling or prenatal testing. The trial court made no findings with regard to the plaintiff's allegations that Dr. Fasnacht and Nurse Melvin breached their respective duties of care by improperly prescribing and/or improperly administering Depakote to Megan. Therefore, the trial court misstated its findings, and erred in concluding that there was no negligence to transfer to Julia. According to the record, summary judgment was entered before the deadlines for disclosure of expert witnesses. Whether Dr. Fasnacht and Nurse Melvin breached their respective duties by improperly prescribing and/or administering Depakote to Megan, and without adequately informing her of the Depakote's risks of birth defects, and whether prenatal exposure to Depakote was a proximate cause of Julia's injuries are questions of fact to be decided by the factfinder, after considering expert testimony. Accordingly, we conclude that the trial court erred in entering summary judgment in favor of Dr.

21

Fasnacht, Rhonda Melvin, R.N., and NeuroRestorative on Julia's claims for transferred negligence. As to those claims, the summary judgment is reversed, and the cause is remanded for further proceedings.

¶ 54                          C. Summary Judgment—Negligent Supervision

¶ 55     Next, we consider whether the trial court erred in entering summary judgment in favor of the NeuroRestorative defendants on Megan's claims for negligent supervision. In its judgment order, the trial court found that there were no disputed issues of material fact, and that the NeuroRestorative defendants were entitled to judgment as a matter of law because Megan voluntarily signed a waiver of liability upon admission to the NeuroRestorative rehabilitation program. The court found that Megan was competent to make her own decisions, including the decision to sign the waiver, and that the waiver was clear and unambiguous. On appeal, the plaintiff claims that there were genuine issues of material fact regarding Megan's capacity to sign the waiver and her ability to understand the waiver. The plaintiff also argues that there are questions regarding whether the waiver encompassed the situations and dangers Megan encountered at NeuroRestorative.

¶ 56     Under appropriate circumstances, a person may by contract avoid liability for his or her negligence. *Larsen v. Vic Tanny International*, 130 Ill. App. 3d 574, 576 (1984). Absent fraud or willful and wanton negligence, a contract's exculpatory clause will be valid and enforceable unless there is a substantial disparity of the parties' bargaining position, the social relationship between the parties militates against upholding the clause, or enforcement of the exculpatory clause would violate public policy. *Hawkins v. Capital Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 18. When none of these factors is present, the question of whether an exculpatory clause will be enforced depends on whether the defendant's conduct and the risk of injury inherent in that conduct was of

22

a type intended by the parties to fall within the scope of the clause. *Hawkins*, 2015 IL App (1st) 133716, ¶ 18.

¶ 57    Exculpatory clauses are not favored, and courts will closely scrutinize them and strictly construe them against the party seeking to rely on them, especially when that party also drafted the waiver. *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 112 Ill. 2d 378, 396 (1986). Close scrutiny is warranted because when a plaintiff expressly consents to relieve a defendant of its duty of care, the plaintiff assumes the risk of harm should the defendant breach that duty. *Larsen*, 130 Ill. App. 3d at 576. Foreseeability of a specific danger is an important element of the risk which a party assumes, and, therefore, serves to define the scope of an exculpatory clause. *Larsen*, 130 Ill. App. 3d at 577. An exculpatory clause should contain clear, explicit, and unequivocal language referencing the type of activity, circumstance, or situation that it encompasses and for which the plaintiff agrees to assume the risk. *Hawkins*, 2015 IL App (1st) 133716, ¶ 19. The parties need not have contemplated the precise occurrence that results in injury, but the injury must fall within the scope of possible dangers ordinarily accompanying the activity, and therefore, reasonably contemplated by the plaintiff. *Hawkins*, 2015 IL App (1st) 133716, ¶ 19. No agreement to assume unknown risks shall be inferred. *Larsen*, 130 Ill. App. 3d at 577. Whether the particular injury ordinarily accompanies a certain activity and whether the plaintiff understands and assumes the risk associated with the activity are often questions of fact, precluding summary judgment. *Hawkins*, 2015 IL App (1st) 133716, ¶ 20.

¶ 58    The NeuroRestorative admissions agreement at issue provided in pertinent part:

> "I voluntarily consent to admission to the NeuroRestorative and to receive such evaluation and rehabilitation assistance as deemed necessary and appropriate by NeuroRestorative staff and consulting professionals. I also acknowledge and understand that I have certain rights and responsibilities as a program participant at NeuroRestorative and that I will be oriented to these rights and responsibilities by the appropriate NeuroRestorative staff person(s). ***

23

NeuroRestorative is interested in the safety of the entire program participants for whom we provide assistance. In our experience, the use of alcohol and illegal drugs, unprotected sexual activity, refusal to follow physician orders, leaving a program unsupervised, or community access prior to receiving necessary orientation and safety training may result in unsafe situations. While NeuroRestorative can educate, provide structure, and make recommendations to minimize the likelihood of unsafe circumstances occurring, we cannot share responsibility when a program participant makes his/her choice to engage in an activity that is contrary to our professional recommendations or illegal in nature.

In the event that I voluntarily engage in any of the above listed activities, I agree to release NeuroRestorative from any and all liability for resultant consequences."

¶ 59 Before turning to the language of the exculpatory clause and waiver, we consider whether there were disputed issues of material fact as to Megan's competence and ability to understand the exculpatory clause and waiver of liability. The ability to comprehend the nature and effect of entering into a contract is essential to the formation of a valid contract. *Thatcher v. Kramer*, 347 Ill. 601, 609-10 (1932). To make a valid contract, each party must be of sufficient mental ability to comprehend the nature of the transaction and protect his or her own interest. *Thatcher*, 347 Ill. at 609-10.

¶ 60 When Megan signed the admissions agreement, she was 25 years old, and she was not under a legal guardianship. The NeuroRestorative admission notes and the participant overview profile, completed on or within a week of Megan's admission, indicated that Megan was her own guardian, and that Megan's mother was closely involved in Megan's care. The admission notes also indicated that Megan displayed a degree of cognitive impairment. Staff members testified that on the date of Megan's admission to the NeuroRestorative facility, Megan thought she was in Lexington, Louisiana, not Carbondale, Illinois. According to the admission notes, Megan's barriers and challenges included a lack of insight and impairment of executive functioning, reasoning, and judgment. She was prone to exploitation by peers, easily led, and at risk because of inadequate personal safety skills. The staff notes indicated that attention should be paid to

24

"potential issues with male peers." The NeuroRestorative records also contained a written report by Dr. Claudia Kachigian, dated October 21, 2011. In that report, Dr. Kachigian noted that three months prior to admission, Megan had neuropsychological tests that indicated severe executive function impairment, disinhibition, and verbal memory disturbance. Dr. Kachigian's evaluation demonstrated that Megan was oriented to time and place, but she displayed impaired judgment and insight.

¶ 61   The record also contains additional medical evidence that sheds light on Megan's cognitive status and her ability to understand the waiver of liability and to assume the risks associated therewith. At the time of Megan's admission to NeuroRestorative, Nurse Melvin testified that she did not explain the risks and benefits of Megan's medications with her because she did not think Megan was capable of managing her medications on her own. Dr. Gilbert, a psychiatrist who evaluated and treated Megan during a hospital admission in October 2007, noted that Megan had no "abstract reasoning whatsoever." Dr. Gilbert did not advise Megan about Depakote's risks because Megan was not able to process the information at that time. Dr. Gilbert acknowledged that she had no discussions with Megan's mother regarding guardianship at the time of Megan's evaluation. Dr. Gilbert also testified that she thought that Megan would have needed a guardian and that Megan could not have made her own decisions about medications. Additionally, Dr. Strobel admitted that he did not warn Megan or her mother specifically about an increased risk of spina bifida in the babies of women who took Depakote while pregnant. Dr. Strobel's records included a notation in 2006 that Megan "lacks the capacity for decision-making and self-determination."

¶ 62   In this case, there is some evidence indicating that Megan, because of her brain injury, was incapable of understanding the exculpatory clause and waiver. There is also evidence that the

25

NeuroRestorative defendants were aware of Megan's mental condition at the time Megan signed the agreement containing the exculpatory clause and waiver. Taking the evidence and all reasonable inferences therefrom in a light most favorable to the plaintiff, we find that there are genuine issues of material fact regarding whether Megan had the mental competence and ability to understand the exculpatory clause and waiver of liability.

¶ 63    There are also genuine questions of material fact regarding the scope of the exculpatory clause and waiver. In this case, the NeuroRestorative defendants argue that Megan agreed to release them from "any and all liability for resultant consequences" of engaging in unprotected sexual activity. The parties agree that pregnancy and sexually transmitted diseases are ordinary risks of unprotected sexual activity. Megan testified that she knew about those risks. Nevertheless, Megan repeatedly and adamantly testified that none of her health care providers, including those at NeuroRestorative, ever informed her that if she became pregnant while taking Depakote, she was at serious risk of having a child with major birth defects, including spina bifida. As noted above, Nurse Melvin did not recall having any conversations specifically about Depakote's risks. Melvin recalled one conversation in which she advised Megan that seizure medications can have bad effects on babies and that if Megan wanted a family, that would need to be planned and closely monitored by a doctor. That conversation was not documented in Melvin's assessment notes. Dr. Fasnacht admitted he did not discuss Depakote's risks of birth defects with Megan because he presumed that Dr. Strobel had done so. Dr. Strobel admitted that he did not warn Megan or her mother specifically about an increased risk of spina bifida in the babies of women who took Depakote while pregnant. Dr. Gilbert testified that she discussed Depakote's risks with Megan's mother because Megan was not able to process the information.

26

¶ 64    To enforce an exculpatory agreement, an injury must fall within the scope of possible dangers ordinarily accompanying the activity, so that the person assuming the risk has notice of the range of dangers for which she is assuming the risk of injury. The standard to be applied is subjective and geared toward a particular plaintiff and her situation. *Larsen*, 130 Ill. App. 3d at 576-77. Under the circumstances of this case, we are unable to hold, as a matter of law, that the risk of having a child with birth defects was a danger within the scope of the exculpatory clause. Foreseeability of a specific danger is an important element of the risk which a party assumes, and no agreement to assume unknown risks will be inferred. *Larsen*, 130 Ill. App. 3d at 577.

¶ 65    Finally, the NeuroRestorative defendants also argue that the plaintiff cannot establish proximate cause because Megan's engagement in unprotected sexual activity while on Depakote constituted a superseding and intervening cause of her pregnancy. They claimed that Megan was informed that she should not engage in unprotected sex while she was taking Depakote, that she was consulted regarding the need for birth control, and that she refused birth control. A "superseding cause" is a natural force or act of a third party that intervenes between the defendant's tortious conduct and the injury at issue to absolve the defendant of liability. *Thomas v. Khoury*, 2021 IL 126074, ¶ 6. In such situations, both the tortious aspect of the defendant's conduct and the intervening act are causes in fact of the injury, but for reasons of fairness, the defendant's conduct is no longer considered a legal cause. *Thomas*, 2021 IL 126074, ¶ 5. Not every intervening act amounts to a superseding cause. An intervening force or act will constitute a superseding cause only when it is both independent of the defendant's action, and of such an extraordinary, unforeseeable nature that the original wrongdoer cannot rightfully be held liable for the plaintiff's injuries. *Thomas*, 2021 IL 126074, ¶ 5; *Bentley v. Saunemin Township*, 83 Ill. 2d 10, 15 (1980). Whether an intervening act amounts to a superseding cause such that the defendant's tortious

27

conduct cannot be deemed a legal cause is a question of fact to be resolved by the factfinder. *Thomas*, 2021 IL 126074, ¶ 6. On this record, we find that there are genuine issues of material fact as to whether Megan was adequately informed of and understood the risks and consequences of her actions, and whether her acts were reasonably foreseeable, thereby precluding summary judgment.

¶ 66                                    III. CONCLUSION

¶ 67    In summary, the trial court properly dismissed the claims against the Strobel defendants for lack of specific personal jurisdiction. The trial court erred in entering summary for Dr. Fasnacht, Rhonda Melvin, R.N., and the NeuroRestorative defendants on Julia's claims for transferred negligence. The trial court also erred in entering summary judgment for the NeuroRestorative defendants on Megan's claims for negligent supervision. Accordingly, the judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

¶ 68    Affirmed in part and reversed in part; cause remanded.

*Solomon, et al. v. Center for Comprehensive Services, Inc., et al.,* 2023 IL App (5th) 210391

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Jackson County, No. 13-L-63; the Hon. Christy W. Solverson, Judge, presiding. |
| **Attorneys for Appellant:** | Christopher F. Cueto, James E. Radcliffe of Belleville, IL, for appellant. |
| **Attorneys for Appellee:** | Jerry P. Connolly, Corinne M. Cundiff, Jeffrey J. Escher, Michael D. Krause of Connolly Krause, LLC of Chicago, IL (for Naomi Booker, Darcy Kriegsman, Rhonda Melvin, Neurorestorative Carbondale); Michael F. Lecinski, Katherine A. Melzer, Kathleen L. Pine, Timothy C. Sansone of Sandberg, Phoenix & von Gontard, P.C., of St. Louis and Carbondale, IL (for Elbert Fasnacht II M.D., Ltd., Elbert Fasnacht); Jerrod H. Montgomery, Charles E. Schmidt (for Josephson, Wallack, et al. and D. Douglas Strobel) of Carbondale, IL. |